**MORTON SALT COMPANY, Royal Crystal Salt Company, Deseret Livestock Company and Deseret Salt Company, Appellants,**

v.

**UNITED STATES of America, Respondent.**

**Nos. 5318–5321.**

United States Court of Appeals Tenth Circuit.

July 5, 1956.

Paul H. Ray, Salt Lake City, Utah (L. M. McBride, Chicago, Ill., S. J. Quinney, Salt Lake City, Utah, and C. Preston Allen, Murray, Utah, were with him on the brief), for Morton Salt Co. and Royal Crystal Salt Co.; Nathan J. Fullmer, Salt Lake City, Utah (Louis H. Callister and David A. Robinson, Salt Lake City, Utah, were with him on the brief), for Deseret Salt Company.

Lyle L. Jones and Don H. Banks, Attys., Dept. of Justice, San Francisco, Cal. (John H. Burgess, Atty., Dept. of Justice, San Francisco, Cal., Stanley N. Barnes, Asst. Atty. Gen., and A. Pratt Kesler, U. S. Atty., Salt Lake City, Utah,

were with them on the brief), for respondent.

Before HUXMAN, MURRAH and PICKETT, Circuit Judges.

HUXMAN, Circuit Judge.

These consolidated appeals are from a judgment of the United States District Court for the District of Utah finding appellants guilty of violating Section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1. The grand jury indictment charged that appellants Morton Salt Company, Royal Crystal Salt Company, Deseret Livestock Company and Deseret Salt Company, together with the Stansbury Salt Company and Council M. McDaniel, not named defendants, were members of a conspiracy in restraint of trade: (a) to stabilize and control the prices and terms for the sale of salt; (b) to adopt and maintain uniform and non-competitive prices and terms for the sale of salt; (c) to restrict and eliminate price competition between themselves and with others in the sale and distribution of salt; (d) to adopt and use uniform price scales and price keys; and (e) to eliminate distributors who sell at less than agreed upon prices.

The right to a jury was waived and the case was tried to the court. After a trial that consumed 10 days and in which more than 1,000 exhibits were introduced, the court found all appellants guilty as charged. At the time of rendering decision the trial judge explained the considerations and reasons for his judgment in concise, summary comments, which he later adopted as the special and general findings of fact. The only question presented on appeal is whether the evidence justified the guilty verdicts.

The essential facts on the market area and the competitive background here involved are not controverted. All these companies obtain, or obtained, their salt from the Great Salt Lake and have their processing plants in Utah. The salt is sold in the intermountain area between Colorado on the east and Nevada, Oregon and Washington on the west, comprising several states. Prior to 1952 Morton Salt Company and its wholly owned subsidiary Royal Crystal Salt Company, maintaining separate sales offices and operating under different brand names, enjoyed a virtual monopoly of the sale of salt in this area. No other company was selling more than a negligible quantity of salt from the Great Salt Lake and these two appellants' only competition was on the western and eastern fringes of the intermountain area where freight costs enabled the California and Kansas salt producers to compete.

In 1949 the Deseret Livestock Company began the preparation of facilities for the production of salt from the Great Salt Lake. In 1951 it harvested its first crop and made a few small sales, and by 1952 it was in a position to begin substantial competition with Morton and Royal Crystal. Late that year or in early 1953 the ownership of the Deseret Livestock Company came into the hands of David Freed and David Robinson. Knowing little about the salt business these two went to Freed's long time friend, I. A. Clayton, Vice President and Manager of Royal Crystal, to see if that part of Deseret Livestock's business could be sold to Morton. Clayton stated that Morton was not interested bcause of the possibility, if this potentially important competitor was bought out, of monopoly charges under the Sherman Act.

Deseret Livestock kept its salt facilities and sold salt in the area market through the year 1954. Its sales steadily increased, and in 1954 it sold 26,900 tons of salt as compared to 120,657 tons sold by Morton and its subsidiary Royal Crystal. The tonnage sold by Morton and Royal Crystal in 1954 was almost exactly the same as in 1952 [120,657 tons v. 120,028 tons], prior to substantial competition from Deseret Livestock.

Stansbury Salt Company started selling salt in about December, 1950, and its sales progressed much less rapidly than Deseret Livestock. In 1954 it sold about 7,000 tons. Its position as a potential competitor by the end of 1954 was much stronger than its sales show, however, as evidenced by the fact that in 1954 it add-

ed some 10,500 tons to its inventories. Also it acquired a block press in that year and thus was able to remedy its deficiency in block salt which had theretofore hampered its attempts to gain a substantial market.

Council M. McDaniel entered the picture here in the summer of 1954. He was a former executive in a west coast salt company, and sought to purchase an interest for himself in a salt business in the Salt Lake area. He negotiated with Stansbury Salt Company with a view to acquiring shares of that company. It was his introduction of Richards, the manager of Stansbury, to Clayton of Royal Crystal which allegedly precipitated Stansbury's entry into the conspiracy. McDaniel finally purchased the salt properties of Deseret Livestock, and from and after January 1, 1955, operated the business as the Deseret Salt Company.

The price fixing conspiracy was alleged to have begun between Royal Crystal, Morton and Deseret Livestock some time in 1953, with Stansbury and McDaniel, as an individual, joining it in the middle of 1954. After the sale of Deseret Livestock's salt properties to McDaniel as of January 1, 1955, the new Deseret Salt Company, under McDaniel's direction, allegedly joined the conspiracy in Deseret Livestock's former role.

I. A. Clayton, manager of Royal Crystal, apparently established the prices, or initiated price changes, for both Royal Crystal and Morton in the Salt Lake area. Morton and Royal Crystal did not compete pricewise, and the two used identical pricing data. Upon entering competition Deseret Livestock in 1952 hired as sales manager Frank Jensen, who until 1947 had been a salesman in the area for Morton. When he left Morton's employ Jensen had taken a complete list of Morton prices, and in a subsequent position buying salt for a water softener company he had kept up with most changes in prices. He established the first price scales and keys for Deseret Livestock based upon this information, and such prices were apparently nearly identical to those charged by Royal Crystal and

Morton. But there is abundant evidence that during 1952 and 1953 he often varied and undercut Morton and Royal Crystal to obtain business. Freed, who became his superior at Deseret Livestock, complained several times in his testimony that Jensen was always "cutting prices and chiseling wherever he could."

It is also clear, and not denied by appellants, that beginning in late 1953 and continuing through the prosecution period the price scales and keys used by Deseret Livestock, Morton, and Royal Crystal were practically identical. The only price variation occurred apparently when Jensen disobeyed the instructions of Freed and "chiseled" on the price. It was testified that in April or May 1954 Deseret Livestock took the price scales, and keys sent them by Royal Crystal, removed the covers and merely stapled on new cover sheets which bore the name of Deseret instead of Royal Crystal.

It is admitted that beginning in 1953 there was a completely free exchange of pricing information between Deseret, Royal Crystal and Morton, and that after the summer of 1954 this exchange included Stansbury. Pricing information, keys and scales were sent to one another and any changes which were of interest to the other salt producers were communicated immediately. Whenever a variance from the "usual" or "correct" price was revealed there would be telephone calls, apparently nearly always initiated by Clayton, to ascertain if such variance was an error or a new price.

Freed testified that when he first approached Clayton to attempt a sale of Deseret Livestock's salt properties, he was informed that Morton and Royal Crystal would follow any price changes initiated by Deseret. His statement of this conversation with Clayton, in part, is as follows:

"Well there was some discussion regarding prices—in a general way we talked about that—and we were told, at the time, that we were free to set our own prices anywhere that we wanted, that we could compete on a high level or a low level; that they

had their own prices which they had arrived at after a long period of time, and if we changed those prices, they would change with us, but, so far as they were concerned, those prices were right, and they were hopeful we would stay with them, but it was our own business to do as we saw fit regarding the prices."

From this he understood that if Deseret Livestock cut prices Morton and Royal Crystal intended to follow, and that if Deseret put its price back up Morton and Royal Crystal would also raise their prices. Clayton stated that the purpose of his calls to Freed on price variations was to ascertain whether such were real price changes which he would have to meet or whether they were merely errors in computation. There is no question but that Morton and Royal Crystal met every price cut instituted by Deseret Livestock, and also followed every increase. During the dates of their alleged participation in the conspiracy most price changes were instituted simultaneously by all the companies. There was testimony that Clayton informed Freed of a proposed increase in the price of roasting salt, above the long established price, to be effective three months in the future. Freed for Deseret Livestock instituted the same price increase effective at the same time. Richards of Stansbury testified that he once put in a bid price of $8.00 to a governmental agency when the printed pricing information he had from the other companies indicated they would bid $6.75, but that from previous conversations with Clayton and Freed he had the definite belief that the other companies would also bid $8.00, as they apparently did.

In justification the appellants urge that it is not a breach of the Sherman Act to pass to each other such pricing information as was exchanged. And they contend that their adherence to identical prices is merely "conscious parallelism" in pricing behavior, as is essential in an industry with such a standardized, homogeneous product as salt. They produced expert witnesses who testified that since all salt is virtually alike and the major consumers are generally informed buyers a fraction of a cent difference in price will cause a major shift in business; thus by operation of the laws of economic behavior the tendency is to highly uniform prices in a market area. Nevertheless, it seems clear that the free disclosure to each other of pricing data and proposed bids speeded the achievement of uniform prices. Appellants urge otherwise because they say the information was readily accessible from other trade sources. While the publication of prices bid to government agencies and a spy system would undoubtedly reveal partial pricing information on competitors, some of the evidence shows extensive information was not easily acquired. For one thing the bids among these companies to government agencies prior to the alleged conspiracy show quite a dissimilarity in quoted prices. That Stansbury did not have accurate information on the others' pricing before Clayton gave Richards a copy of Royal Crystal's price keys and scales is apparent from the testimony. Utah Ice and Storage Company, a small competitor and a buyer of undried salt from Deseret, apparently was not able to obtain such information.

■ It is true that the Supreme Court in Maple Flooring Ass'n v. United States, 1925, 268 U.S. 563, 457 S.Ct. 578, 69 L. Ed. 1093, and Cement Mfrs.' Protective Ass'n v. United States, 1925, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104, held that the mere compilation and disseminating among competitors of statistics containing pricing information did not prove conspiracy in violation of the Sherman Act. But those cases carefully stated that there was no other evidence of conspiracy and that no resulting substantial identity of prices were shown. In other cases where there was an exchange of a substantial amount of information and a tendency toward a restriction of output,[1] or toward price uniformity,[2] con-

1. American Column & Lumber Co. v. United States, 1921, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284.

2. United States v. American Linseed Oil Co., 1923, 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035.

victions were upheld. The follow-up for explanations of price deviations and the general pricing pressure in the American Linseed Oil Company case make it more similar to the instant situation than the decisions relied upon by appellants. In Sugar Institute, Inc., v. United States, 1936, 297 U.S. 553, 599–600, 56 S.Ct. 629, 642, 80 L.Ed. 859, the court said, "And, while the collection and dissemination of trade statistics are in themselves permissible and may be a useful adjunct of fair commerce, a combination to gather and supply information as a part of a plan to impose unwarrantable restrictions, as, for example, to curtail production and raise prices, has been condemned * * * each case demands a close scrutiny of its own facts." In the instant case we have more than a dissemination of statistics, there was a frank exchange, between competitors controlling 95% of the market, of all the details of a fairly complicated pricing system. Certainly the exchange is a factor appropriately considered in determining the existence of a conspiracy.

It is also true it "has never [been] held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense." Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 1954, 346 U.S. 537, 541, 74 S.Ct. 257, 259, 98 L.Ed. 273. But that case and others recognize that such behavior is another item to be weighed, and generally to be weighed heavily, in the determination. The intermountain market in salt is served by only a few suppliers, an oligopoly in economic terms, and the product is a standardized one for which there is a relatively stable, inelastic demand. In such a situation it is almost inevitable that the pricing policies of one company will be influenced and to some extent dictated by knowledge of probable countervailing action by its competitors. And this perhaps detracts from the weight we should give to parallel pricing. But the presence of only a few friendly sellers and the stable demand for the product present a great opportunity and temptation to combine to maintain prices at an artificially high level profitable to all.

The compelling inference from the evidence already recited above would indicate that the instant case presents more than an example of conscious parallel business behavior. But there is other evidence in the record which seems inconsistent with any conclusion other than that a pricing conspiracy was in existence. One such example was the handling of sales of salt to the Utah Ice and Storage Company. This company had a business in which it iced trucks and railroad cars and provided cold storage facilities for the general public. There had been a falling out with Morton and Royal Crystal, and those two companies would not sell to Utah Ice. Deseret Livestock was interested in the business and for a long time sold undried salt to it at $5.20 per ton. Utah "kiln dried" the raw salt with its own reprocessing equipment, in which it had an investment of about $50,000. It was able to reprocess an excess above its own needs, which it resold to the general public in competition with kiln dried salt of the other producers; in Idaho this salt was being sold at lower prices than that of Morton and Royal Crystal. There was positive evidence that while Deseret Livestock considered Utah Ice a competitor in a sense, it was not feeling any effects of that company's competition, and Deseret Livestock at the time was not selling salt in Idaho, where the price cutting was being done.

Morton and Royal Crystal felt the competition keenly, however, and Clayton admitted that he called Freed several times about the matter. Freed finally went to Hecker of Utah Ice and told him that pressure was being put upon him to do something about the situation, and that under the circumstances Deseret Livestock would have to discontinue sales of raw salt to Utah Ice because its prices were out of line with competitors. He prepared a letter containing a substitute proposal to sell kiln dried salt to Utah Ice for its own use at $5.75 per ton and provided that any excess would have to

be paid for at the price charged to the general public. This proposal was rejected by Utah Ice. After another meeting with Hecker of Utah Ice in late June 1954, at which McDaniels joined Freed in an attempt to persuade Hecker, a second letter was prepared lowering the price on kiln dried salt for Utah Ice's own use to $5.50 per ton but providing that any salt for resale would have to be purchased at the Deseret Livestock's regular price, which was $8.00, the same as that at which Morton and Royal Crystal sold to the general public. Prior to sending the second letter the matter was discussed with Clayton, who went over the letter suggesting word changes which were apparently adopted. Clayton thanked Freed for his action. This action, of course, virtually eliminated Utah Ice from the salt resale business, with a resultant reduction in the amount of salt it purchased from Deseret Livestock. Also, the price given Utah Ice of $5.50 per ton for kiln dried salt as compared to the prior $5.20 per ton for raw salt seems economically less profitable to Deseret Livestock. The compelling conclusion from this would seem that Deseret was acting against its economic interest in dealing with Utah Ice in such a manner, unless it would benefit in other ways from this yielding to the demands of competitors. The natural inference is that the action was pursuant to the conspiracy and Deseret believed that the long run benefit to it by helping maintain higher price levels was greater than this loss of raw salt business. A company with no assurance concerning the maintenance of the price level and not itself feeling Utah Ice's sales competition, would not fear retaliatory pricing action and would hardly willingly surrender this business.

Another course of conduct indicating the conspiracy was Freed's requirement that his sales manager, Jensen, clear all bids through him personally before their submission. Jensen would compute the bid he thought should be made and advise Freed of the figures. Freed would reply, "I'll check and call you back," or words to that effect. He would later con-firm the figures or advise of the proper prices to submit. Freed's own testimony, however, is that the calculation of salt prices is complicated and that he had never tried to make such a computation. The only reasonable inference from this is that he took Jensen's figures and called competitors, most likely Clayton, to see what the other bids would be.

Admittedly the requirement that Jensen obtain Freed's approval on bids was instituted because of Jensen's conduct in attempting to gain business through bidding lower prices than competitors. The culminating incident was in connection with a bid to the Galigher Company, a large salt user. The Galigher bid form called for a fixed price for the year. Morton had bid on its own form, providing the right to change prices quarterly, and its bid price was worked out to four decimals. Freed called Clayton to see what Morton and Royal Crystal were doing on that bid and, upon being told, requested a copy of the bid form. Clayton sent Morton's form with the figures filled in, and Freed showed it to Jensen telling him that was what Deseret Livestock was going to bid.

Jensen wrote up the bid but left off the last two decimals; Deseret Livestock had never carried a bid to four decimals before. Because of this omission Deseret Livestock was the low bidder by $2.32 on a contract involving more than $38,000, and received the business. Jensen was reprimanded by Freed for undercutting the competitor, and thereafter his authority was strictly limited.

This example of aversion to obtaining business by a lower price, no matter how minimal, and of the policy to obtain in advance the competitor's bid and studiously copying that bid exactly, is typical of the conduct of these competing companies as shown by the record. It seems wholly inconsistent with any conclusion but that a price conspiracy existed between them.

Not all incidents supporting the conspiracy will be recited in detail, but there are several. Among them would seem: Freed's asking Clayton for suggestions

on a new manager to replace Jensen and his having the competitor interview the proposed employee to instruct and orient him on the salt business; the policy of sending Royal Crystal price lists to the office of Deseret Livestock's lawyer and to the home of Richards, manager of Stansbury, rather than to the company offices; and Freed's telling his new manager to check with Royal Crystal if he had difficulty or wanted to ascertain freight rates.

██ The appellants contend that the evidence on which they were convicted was wholly circumstantial, and they have attempted to give explanations for their conduct consistent with innocence. Under these conditions, they urge, a stricter standard of proof is required than where there is direct evidence. Relying strongly upon Pevely Dairy Co. v. United States, 8 Cir., 1949, 178 F.2d 363, they apparently contend that the appellate court must itself weigh the evidence and reverse the convictions unless the circumstantial evidence is wholly consistent with guilt and entirely inconsistent with innocence.[3] In our view we need not pass upon whether the evidence was all circumstantial or whether, if it was, a different standard of review should be applied, because even the test urged by the appellants is satisfied. Viewed in its entirety the evidence, most of it the testimony of involved officers of the appellant companies, compels the conclusion that there was an understanding between these companies, which control over 95% of the intermountain salt market, to maintain prices at uniform and noncompetitive levels. It is well established, of course, that price fixing agreements are illegal per se under the Sherman Act, without regard to the reasons advanced to justify them.[4]

There remains to be considered only the Deseret Salt Company's assertion that it was not proved to be a member of the conspiracy. That company is the result of McDaniel's purchase of the salt properties of Deseret Livestock, and it has only been in operation since January 1, 1955. Nearly all of the evidence introduced related to happenings before Deseret Salt had been in operation. McDaniel, as an individual, was tied into the conspiracy from and after mid-1954, and his knowledge of it is relevant to the actions of the company he formed and directs. The Government relied upon two particular incidents to prove that Deseret Salt participated in the conspiracy. One of these was the action by McDaniel as manager of the new Deseret Salt Company refusing to change the terms of the arrangement forced upon Utah Ice, with McDaniel's participation, by Deseret Livestock, by which it refused to sell Utah Ice undried salt and required it to buy kiln dried salt in excess of its own needs at the "prevailing" price charged by all the companies.

The second incident was the nearly simultaneous dropping of the 8 cent per ton cash discount, which all the companies had theretofore allowed, immediately after a meeting in January, 1955, called by McDaniel, ostensibly for other purposes. The witnesses, except for Richards, testified that the discount was not mentioned and there was no agreement at the meeting to discontinue it. Richards' testimony was equivocal but indicated that there was some discussion of prices and perhaps of the discount. If the companies were all so close to eliminating the discount independently, in light of the previous freedom with which prices were discussed, it seems unlikely the matter would not arise at a meeting attended by all these competitors. The trial judge concluded that there was "at that meeting, an agreement, either tacit or ex-

3. See also Leslie v. United States, 10 Cir., 1930, 43 F.2d 288; but cf. Holland v. United States, 1954, 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150; United States v. New York Great A. & P. Tea Co., 7 Cir., 1949, 173 F.2d 79; C-O-Two Fire Equipment Co. v. United States, 9 Cir., 1952, 197 F.2d 489.

4. United States v. Trenton Potteries Co., 1927, 273 U.S. 392, 47 S.Ct. 377, 71 L. Ed. 700; United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 212–218, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. New Wrinkle, Inc., 1952, 342 U.S. 371, 377, 72 S.Ct. 350, 96 L.Ed. 417.

press, to eliminate the discount, or that it had already been arrived at between the parties, and the go-ahead was indicated at that time."

It has been held that once a conspiracy is proved a relatively small amount of evidence connecting a particular defendant with that conspiracy will suffice to sustain a guilty verdict.[5] Considering the above together with the evidence that Deseret Salt continued its predecessor's policy of nondeviation from the prices of the others and that it apparently participated in the exchange of pricing information, there is enough to connect Deseret Salt to the conspiracy.

Affirmed.

---

5. Luteran v. United States, 8 Cir., 1937, 93 F.2d 395; Meyers v. United States, 6 Cir., 1938, 94 F.2d 433.