**UNITED STATES of America,
Plaintiff,**

v.

**WOHL SHOE COMPANY et al.,
Defendants.**

**Civ. No. 9187.**

United States District Court,
D. New Mexico.

Jan. 16, 1974.

Victor R. Ortega, U. S. Atty., Albuquerque, N. M., Lawrence W. Somerville, Leon Weidman, Richard E. Neuman, Michael J. Dennis, Dept. of Justice, Antitrust Div., Los Angeles, Cal., for plaintiff.

Veryl L. Riddle, Edwin S. Taylor, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., Standley, Witt & Quinn, John Quinn, Santa Fe, N. M., for defendant Wohl Shoe Co.

## MEMORANDUM OPINION AND JUDGMENT

PAYNE, Chief Judge.

This is an action brought by the United States of America pursuant to Title 15 U.S.C. Section 1, to enjoin an alleged conspiracy in interstate trade and commerce. The defendants are Wohl Shoe Company, a manufacturer and retailer of shoes, Penobscot Shoe Company, a manufacturer of shoes, and two retail shoe companies within Albuquerque, Nordstrom's Albuquerque Inc. and Paris Shoe Stores.

All the defendants either sell shoes in the Albuquerque, New Mexico, shoe market or manufacture and ship shoes for sale within the same market. There can be no question but that the manufacture, shipping and sale of these shoes within the Albuquerque market involves or affects interstate commerce, the jurisdictional prerequisite to the bringing of a suit under 15 U.S.C. 1, otherwise known as the Sherman Act.

The government has alleged in essence that beginning in early 1969, the defendants have engaged in activities with a design to fix and stabilize the retail price of shoes for the Albuquerque, New Mexico, area, and that in furtherance of this design, defendants have engaged in activities designed to boycott, or refuse to deal with, those who do not comply with these practices.

Penobscot Shoe Company, Nordstrom's Albuquerque Inc., and Paris Shoe Stores, all entered into stipulated judgments prior to the date of trial. Therefore, at the time of trial Wohl Shoe Company, a wholly owned subsidiary of Brown Group, Inc., was the only defendant remaining.

The matter came before the Court for trial on September 17, 1973, and was concluded at the end of the plaintiff's evidence, the defendant having chosen not to put on any evidence but to rely on certain motions which will be discussed at the end of this opinion.

The evidence offered by the government sought to prove basically two things. First, that there was an agreement by the Wohl Shoe Company as a retailer of shoes and the other retailers within the Albuquerque area to fix prices in what is known as a "horizontal price fix" scheme. Secondly, that Wohl Shoe Company and Penobscot Shoe Company, as manufacturers, furthered the conspiracy to fix prices by boycotting or refusing to deal with, a price cutting competitor known as the Shoe Box, owned by one Norman Machtinger.

The evidence showed that Wohl Shoe Company followed the practice of the "50% mark-up" in pricing its retail shoes and in suggesting prices for shoes sold to other retailers. This is indicated

by the letter dated December 21, 1967, from Joseph E. Bradley, who was the vice-president in charge of sales for Brown Group Inc., Wohl's parent corporation at that time. It was further indicated by all the witnesses that this was the general practice within the shoe industry for the Albuquerque, New Mexico, area.

■ The fact that Wohl Shoe Company followed a 50% mark-up practice and suggested such practice to other retailers is not, in and of itself, a violation of the Sherman Act, United States v. Colgate and Company, 250 U.S. 300, 39 S. Ct. 465, 63 L.Ed. 992 (1919).

■ Also, the fact that Wohl and its other alleged co-conspirators, Nordstrom's, Paris, and others, may have checked or "shopped" each other's prices is not enough, in and of itself, to establish any violation of the Sherman Act, Cement Mfg. Protective Assn. v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L. Ed. 1104 (1925).

■ However, if there was any practice, by which Wohl Shoe Company and its alleged co-conspirators followed a scheme or system of agreeing on prices, checking each other's prices, and keeping said prices uniform then this would be a violation of the Sherman Act. The Supreme Court has made it clear that the government need not prove an expressed agreement so long as it is proved that there is a concert of action the end of which is to conform to an arrangement to fix prices, United States v. United States Gypsum Company, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948), United States v. Paramount Pictures, 334 U. S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948).

Cases involving price fixing have generally been carefully scrutinized by the Courts and the Supreme Court has held that the exchange of price information may be a violation if that exchange "tends toward price uniformity", United States v. Container Corp. of America, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969), and that "any combination

which tampers with price structure is . . . an unlawful activity", United States v. Socony-Vacuum Oil Company, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). It is in the light of these cases that the Court has looked at the evidence offered in relation to the defendant Wohl and its alleged co-conspirators in this case.

At the retail level, here in the Albuquerque market, it was testified by Mr. Fred Garcia, the manager of Wohl's Given Brothers Shoe Store and by Mr. William Owen, the salesman for Penobscot Shoe in this area, that the 50% mark-up was the "right price". It is this connotation of "right price" and its application that concerns the Court in this case.

Mr. Garcia testified that if he saw a competitor carrying the same line of shoes at a "dollar less or a dollar more" that he had to "agree with them" and that he did so pursuant to instructions received from his superiors. He further testified on inquiry from the government's attorney that in case of such price disparity that he was told "to agree" and sell "at the same price".

Mr. Henry Killinger, a salesman with Wohl's Given Brothers Store here in Albuquerque during late 1969, the time in question, testified that he told Mr. Garcia about a difference in price between Nordstrom's and the Wohl Store involving a certain line of shoes. He stated that Mr. Garcia went to visit a Mr. Rauley Fox, manager of the Nordstrom's Store, and that Garcia subsequently reported that Fox agreed to bring the price "in line".

Wohl argues that Mr. Garcia's testimony should be given little weight since he did not have the authority to modify prices. However, Mr. Ray Green, the district merchandising manager in Phoenix, Arizona, one of Mr. Garcia's direct superiors, testified that he also checked prices in other stores and that if he noticed a difference he "may mention it" to the store manager. Thus, the testimony of Mr. Green appears to be consistent with Mr. Garcia's testimony that

he did have the authority to agree with a competitor on the right price.

Mr. Garcia further testified that it came to his attention that Mr. Norman Machtinger owner of the Shoe Box, next door to Wohl's Given Brothers Store, was selling a style of Old Maine Trotter shoe at a price less than it was being sold in the Wohl Store. He testified that he went over and talked to Mr. Machtinger about it and "told him that the right price should be . . . what I mentioned to him . . ." That he further "asked him that he should cooperate with Rhodes (Nordstrom's) and ours" and that he did not agree to do so; whereupon Mr.. Garcia reported this refusal to Mr. Green and to Mr. David Bush, Phoenix district manager for Wohl. This particular incident is the subject of further discussion later on in this opinion.

At this point it should be noted that Mr. Machtinger was a former employee of Wohl at the Given Brothers Store here in Albuquerque, and that he was released from his job after Wohl discovered irregularities in its inventory at that store. Mr. Machtinger was released in about July, 1969, whereupon he opened his Shoe Box Store immediately next door to Wohl's Given Brothers Store, in approximately August of 1969.

Mr. Machtinger testified about Mr. Garcia coming over on a Saturday in early September and complaining that Mr. Machtinger was selling one pattern of Old Maine Trotters for a dollar less than Wohl's Given Brothers Store. Mr. Machtinger further testified that Mr. Garcia asked him if he wouldn't come up in price and that upon receiving a negative response he became angry and left the store.

Mr. William Owens, the area salesman for this area for Penobscot, testified that upon the receipt of a price complaint in his territory that his practice was "usually talk to the people involved" for the purpose of trying to "get them together . . . at the right price" which right price was in fact the 50% mark-up. Mr. Owens further testified

that Mr. Rauley Fox, the manager at Nordstrom's had contacted him about the fact that Machtinger was selling a style of Old Maine Trotter for a dollar less than the normal market.

Mr. Machtinger also testified that Mr. Fox had tried to solicit his cooperation as to the sale price on one occasion for Stride-Rite Shoes; and that in the spring of 1970, Mr. Fox had brought his attention to the fact that Paris Shoes had a different price on Evans men's shoes than did Nordstrom's and that Mr. Fox would call Mr. Matteucci of Paris Shoe and get him to change his price.

Mr. John Scowcroft, general manager of the Air Step division of Brown Shoe, parent corporation of Wohl, testified, in the course of an answer to government counsel, that if he got price variance complaints he tried to "influence" and "discuss . . . the merits or wisdom or need for a 50% mark-up". He indicated that he would talk with the variant account or have his area salesman do so.

It is this cooperation, agreement, and attempt to get others to agree on the prices of shoes that takes the actions of the defendant and its alleged co-conspirators out of the realm of permissible price checking and into the realm of conspiring to fix and stabilize prices. It is from these subtleties and small instances and transactions, all of which defendant alleges are mere isolated transactions, which give the Court the overall view that just such a conspiracy existed here. Indeed it is the separate instances and transactions when viewed as a whole that allow the Court to make such a determination. The Supreme Court has stated it is not necessary to prove an expressed agreement, Norfolk Monument Co., Inc. v. Woodland Memorial Gardens, Inc., 394 U.S. 700, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969), so long as it is proved that there was a concert of action contemplated and that the defendants act in conformity therewith, United States v. Paramount Pictures, supra. As the Supreme Court stated in Ameri-

can Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), the circumstances here are such as to warrant a finding that the defendant and the alleged co-conspirators had a unity of purpose or common design or meeting of the minds in an unlawful arrangement.

■■■ The Court finds that the actions taken in this case did constitute a horizontal agreement between competitors to stabilize and fix prices in the Albuquerque area and that this conspiracy and the actions taken in furtherance of the conspiracy, constituted a per se violation of the Sherman Act. A price fixing conspiracy is one of those types of activity which constitutes a per se violation of the Sherman Act, United States v. Container Corp. of America, supra, Kiefer-Stewart Salt Co. v. United States, 235 F.2d 573 (10th Cir. 1956). Any agreement or cooperation, however conceived, to fix and stabilize prices is unlawful per se and the fact that the prices are to be maintained at the going market price is immaterial, United States v. Socony-Vacuum Oil Company, supra.

■■■ The Court is not unmindful of the fact that incidental price parallelism, or simply following price leadership, is not, in and of itself, violative of the Sherman Act, Esco Corporation v. United States, 340 F.2d 1000 (9th Cir. 1965), Cole v. Hughes Tool Company, 215 F.2d 924 (10th Cir. 1954). However, in this instance it appears that Wohl Shoe Company suggested a retail price mark-up of 50%, that its officers and agents not only checked prices with competitors but agreed, urged, and cooperated with them in keeping the prices at a uniform figure, and that they along with the named co-conspirators, participated in these efforts. Further, as will be discussed more fully below, these same named parties sought to solicit cooperation from Mr. Machtinger at the Shoe Box.

Upon learning from Mr. Garcia that Machtinger would not conform his prices, Mr. Bush, the Phoenix district manager, testified that he reported the price cutting to St. Louis where the news went through the chain of command of the Wohl Shoe Company until it reached Mr. Jack Schultz who was the vice-president in charge of merchandising for Wohl Shoe Company. Mr. Schultz in turn called directly to Penobscot Shoe, speaking to Mr. Leon Fischman, vice-president of marketing, and Mr. Phillip Lown, chairman of the Board of Penobscot, telling them that he "wanted the shoes out of that store or else he could not use them". Mr. Schultz could not remember whether price was mentioned to him by Bush or whether he had mentioned price to Fischman or Lown.

Leon Fischman testified, however, that Schultz told him that the Shoe Box was "selling shoes at a dollar under the retail" of what his department was selling them for. Further, the notes taken by Mr. Fischman at the time of their conversation reflects a notation to the effect that the Shoe Box was selling at one dollar below the Given's price. A further notation in this exhibit was to the effect that he couldn't sell Machtinger the Sportscasters, an alternate line of shoe, indicating that Schultz had indeed objected to them selling any shoes to Machtinger, this being in direct contradiction to Mr. Schultz' testimony that he thought he had indicated it would be all right to sell an alternate label to Machtinger. In fact, Schultz wrote a memo to Bush, after his talks to Fischman, indicating that Fischman had assured him that the shoes would be taken out of the Shoe Box and no more shoes shipped to it.

After these conversations Lown and Fischman ordered Mr. Owen, the above mentioned area salesman for Albuquerque, to repurchase the shoes. This was accomplished by Mr. Owen arranging to have two young ladies go to the Shoe Box and purchase all the Old Maine Trotters at retail under the pretext of buying them for an orphanage. There-

after, upon seeking to reorder Old Maine Trotter shoes, Mr. Machtinger was refused access to them by Penobscot.

The shoe companies involved, according to the evidence, had good reason to have the shoes removed from the Shoe Box other than for reasons of price. However, the price issue got into the picture as one of the reasons for the removal, though it was apparent to the Court that the shoes may have been removed anyway.

The Court finds that these actions constituted a part of, and were taken in furtherance of, the horizontal price fixing conspiracy and were equally as unlawful. In fact, this concerted action by those involved could well be taken as a boycott or concerted refusal to deal, which in itself amounts to a per se violation of the Sherman Act, United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), Continental Ore Company v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

The Court is not unmindful of the proof offered by defendant Wohl as to the reasonableness of the actions taken. The Court is not unmindful of the fact that Machtinger was released by Wohl as an employee under somewhat questionable circumstances and that Machtinger then opened a store right next door. A decision by Wohl simply to refuse to deal with Machtinger's Shoe Box, for those reasons alone, might well have been a reasonable business decision, in no way violative of the Sherman Act.

It is with this in mind that the Court is not much impressed with the government's proof concerning the refusal by Brown, parent corporation of Wohl, to sell Machtinger the Air Step line of its shoes. That refusal came before Machtinger opened his store and was charging a price for any shoes, and in light of their problems with Machtinger, such a decision standing by itself, would appear to be legitimate. Other extensive testimony about general line clearance procedures does not appear to the Court to be linked, by the government, to a price fixing scheme or motive but appear to be procedures used by the industry that are not of themselves violative of the Sherman Act. The Court is aware, of course, that this general type of clearance procedure may well be utilized in such a manner as to prohibit competition and bring it within the purview of the Sherman Act, but the evidence here is not indicative of such unlawful use of that practice.

The Court wishes to make it clear that a refusal to deal with someone else is not illegal when it is based on justifiable business reasons other than price. The defendant, and others, had good reason other than price to refuse to deal with Mr. Machtinger. It is unfortunate that the issues became intertwined. The Court does not, by this opinion, wish to leave the impression that the companies, if they choose, could not refuse to deal with Mr. Machtinger for justifiable business reasons. It is unfortunate that the price situation became involved with the removal of the shoes from the Shoe Box. It is apparent that the price situation was involved as evidenced by the testimony of Mr. Fischman. There is no question that the matter of price was mentioned to Mr. Schultz as one of the reasons why Old Maine Trotters should be removed from the Shoe Box. The Court does not, by this opinion, mean to infer that there was anything wrong with the actions of the defendants except as it related to price fixing. Justifiable business reasons may exist in addition to the price situation.

However, as to the incident involving the repurchase of the Old Maine Trotters, it is not enough that there exists a justifiable business reason if in fact an illegal result, such as the suppression of price competition, is also a goal accomplished at the same time, Klor's v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). The Supreme Court has made it clear that

good intentions or motives are immaterial, United States v. United States Gypsum Company, 340 U.S. 76, 71 S.Ct. 160, 95 L.Ed. 89 (1950), and that parties to a price fixing conspiracy are held to have intended the result achieved, United States v. Patten, 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333 (1913).

The Court, therefore, finds that these actions taken as a part of, and in furtherance of, the horizontal conspiracy, above mentioned, and taken in order to boycott and refuse to deal with the Shoe Box, are per se violations of the Sherman Act.

As stated earlier the defendant chose not to put on any evidence but rather to rely upon several motions made at the end of the case.

▇▇▇ The first motion is a motion to strike certain exhibits and certain portions of the offered testimony on the grounds that they were hearsay statements and were not admissible without first showing by direct evidence that there was a conspiracy in existence. The Court finds that this motion is not well taken and should be denied. There is no question but that hearsay testimony is admissible to prove a conspiracy, and the Supreme Court has stated that the combination need not be first shown, Hitchman Cole & Coke Company v. Mitchell, 245 U.S. 229, 38 S.Ct. 65, 62 L.Ed. 260 (1917). In similar cases it has often been held that the order in which the evidence is received is a matter for the Court, and that the conspiracy need not first be shown, United States v. Sansone, 231 F.2d 887 (2nd Cir. 1956). There is direct evidence from Owen, Garcia, Killinger, Schultz, Machtinger, Fischman and Scowcroft, as discussed above, from which the Court could find a conspiracy; however, the Court notes that a conspiracy also may be implied from a course of dealing and other circumstances, American Tobacco Co. v. United States, 147 F.2d 93 (6th Cir. 1944), aff'd 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), a situation which the Court here also finds.

▇▇▇ The second motion is to strike testimony of certain witnesses who were impeached, or had their memory refreshed, by their Grand Jury testimony. The Court finds that this motion is not well taken and should be denied. The Supreme Court has long authorized the use of Grand Jury testimony in subsequent civil actions brought on behalf of the United States, and has held that such use is proper, United States v. Proctor and Gamble, 356 U.S. 677, 78 S. Ct. 983, 2 L.Ed.2d 1077 (1958), United States v. Socony-Vacuum Oil Company, supra. The witnesses so examined were qualified under Rule 43(b) of the Federal Rules of Civil Procedure and were properly cross-examined. Upon cross-examining any such witnesses with his Grand Jury testimony the Government provided defendant with a copy of said testimony. Defendant moved at the end of the government's case to be furnished a copy of Machtinger's testimony before the Grand Jury. Mr. Machtinger's Grand Jury testimony was not used during his testimony at trial, defense counsel did not then ask for it, and the Court therefore felt that the defendant's motion was not well taken at that time.

The third motion is a motion to strike and exclude documents retained by the government under the Court's amended order for impounding documents entered on June 23, 1973, in Cr. No. 24,475, United States v. Wohl Shoe Co., Nordstrom's Albuquerque, Inc., and Paris Shoe Stores. The Court finds said motion is not well taken and should be denied. The government has complied fully with all aspects of the order and there appears to be no basis for the granting of such a motion.

The fourth motion of the defendant is a motion to dismiss based on the allegation that the government has shown no right to relief and has failed to prove its case. In light of the foregoing opinion, and for the reasons expressed therein, the Court finds that this motion is not well taken and should be denied.

The Court finds that the defendant has violated the provisions of the Sher-

man Act, 15 U.S.C. § 1, and that judgment should be entered against it accordingly. Relief will be granted to the extent that such violations affect the Albuquerque area. The pleadings in this case referred only to the Albuquerque area and the Court has consistently held that the evidence should be confined to anything, wherever it occurred, that affected the Albuquerque area.

For all of the foregoing reasons Wohl Shoe Company, its agents, servants or employees are hereby enjoined from violating the Sherman Antitrust Act in the Albuquerque area in the sale of shoes.

This opinion constitutes the Findings of Fact, Conclusions of Law and Judgment of this Court.