**CACKLING ACRES, INC., et al., Plaintiffs and Appellees,**

v.

**OLSON FARMS, INC., Defendant and Appellant.**

No. 74–1850.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Jan. 26, 1976.

Decided Aug. 31, 1976.

Rehearing Denied Oct. 13, 1976.

Michael R. Murphy, Jones, Waldo, Holbrook & McDonough, Salt Lake City, Utah, on the brief), for plaintiffs and appellees.

Harold G. Christensen, Salt Lake City, Utah (Lowell N. Hawkes, Pocatello, Idaho, and Craig S. Cook, Worsley, Snow & Christensen, Salt Lake City, Utah, and Jonathan M. Berge, Los Angeles, Cal., on the brief), for defendant and appellant.

Before LEWIS, Chief Judge, and BREITENSTEIN and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

This is a civil antitrust case brought under the Sherman and Robinson-Patman acts and the antitrust laws of the State of Utah. The plaintiffs are fourteen egg producers, some of whom are also egg distributors. Olson Farms, Inc., one of the defendants, is an egg distributor, with its home office in North Hollywood, California. During the time crucial to the present proceeding Olson Farms also had a processing plant and distribution center in Draper, Utah. A second defendant, Oakdell Egg Farms, Inc., is an egg production facility located in Riverton, Utah. Olson Farms owns a one-half interest in Oakdell.

The plaintiffs commenced this suit as a class action. However, the trial court refused to certify the case as a class action, and the matter came on for trial on behalf of the named plaintiffs only. The plaintiffs charged Olson Farms with violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, as well as violations of the Robinson-Patman Act, 15 U.S.C. § 13, and the antitrust laws of Utah. The gist of the complaint was that Olson Farms had conspired with other egg distributors to fix and depress the prices paid to egg producers and that Olson Farms had also conspired with others to fix the wholesale price for eggs. Additionally, the plaintiffs charged Olson Farms with conspiring with other distributors and egg producers to monopolize the production and distribution of eggs in Utah.

Olson Farms filed a counterclaim against certain of the plaintiffs, alleging commer-

I. Daniel Stewart, Salt Lake City, Utah (Donald B. Holbrook, Ronald J. Ockey, and

cial disparagement, business interference, violations of the Utah Unfair Practices Act, price discrimination, price fixing and other combinations and conspiracies in restraint of trade.

Prior to trial the plaintiffs withdrew their claims based on the Robinson-Patman Act and the antitrust laws of Utah. After a prolonged trial of some two and one-half months, the case was submitted to a jury on a special verdict. This special verdict permitted, but did not require, recovery for the individual plaintiffs under either (1) a restraint of trade violation of section 1 of the Sherman Act, or (2) a conspiracy to monopolize violation of section 2 of the Sherman Act, or (3) an attempt to monopolize violation of section 2 of the Sherman Act. The jury was instructed that an individual plaintiff could only recover once, and the damages of each plaintiff were to be determined on an individual basis. The jury returned a verdict for four of the plaintiffs on the basis of a restraint of trade violation. The individual damages awarded these four plaintiffs totaled $113,469. The remaining ten plaintiffs were each awarded damages for a conspiracy to monopolize violation and their individual awards totaled $461,124.

The counterclaim of Olson Farms was also submitted to the jury, which returned verdicts in favor of the plaintiffs on the issue of liability. In responding to specific inquiry, the jury determined that no damages were sustained by Olson Farms as a result of the plaintiffs' activity. As a result, a judgment of no cause of action was entered with respect to the counterclaim.

The trial court later entered money judgments in favor of the plaintiffs and trebled the jury verdicts. The money judgments ran against Olson Farms only, as injunctive relief was the only relief granted the plaintiffs against the other defendant, Oakdell Farms. As indicated, a judgment of no cause of action was also entered with respect to the counterclaim of Olson Farms. The latter now appeals both judgments.

Olson Farms summarizes its several grounds for reversal as follows: (1) the plaintiffs failed to prove either a restraint of trade or a conspiracy to monopolize violation of either section 1 or 2 of the Sherman Act, (2) the plaintiffs failed to prove any damage, (3) the jury verdict was internally inconsistent and in any event not supported by the evidence, (4) the trial court erred in its instructions to the jury, and (5) the trial court erred in refusing to direct a verdict in favor of Olson Farms on its counterclaim.

## I. Sufficiency of Evidence

■ Olson Farms initially argues that there was insufficient evidence to warrant submission of the case to the jury, be it on the basis of either a section 1 or section 2 violation of the Sherman Act. We disagree and in our view the matter was properly submitted to the jury.

As concerns section 1 of the Act, it was plaintiffs' theory of the case that Olson Farms conspired with other named egg distributors, and additionally conspired with certain egg producers, to depress and fix the price to be paid to egg producers in Utah and in the southern part of Idaho. Olson Farms' position is that there was in reality no evidence of any price fixing efforts, while the plaintiffs counter with the assertion that there was much evidence, both direct and circumstantial, oral as well as written in nature, which, when viewed in its totality, overwhelmingly established that Olson Farms conspired with others to depress the price paid to egg producers in the Utah-Idaho area, and that in fact Olson Farms succeeded in thus depressing these egg prices. As indicated, we are of the view that the state of the record was such as to require submission of the matter to the jury. It would have been error for the trial court to take the case from the jury and direct a verdict for Olson Farms on the grounds that there was insufficient evidence of a section 1 violation.

Olson Farms suggests that the only possible evidence tending to show price fixing was testimony pertaining to price parallelism between the prices paid by Olson Farms to egg producers and the prices paid by its named co-conspirators. In the instant case, according to Olson Farms, the evidence of

price parallelism, such as it was, resulted only from "lawful factors." In this regard, Olson Farms argues that it had a position of leadership in the Utah-Idaho area, and that it was only natural that other egg dealers would pay the same price for eggs as did Olson Farms.

We agree that price parallelism, standing alone, does not necessarily prove a conspiracy to fix prices. *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71, 85 (9th Cir. 1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); *Morton Salt Co. v. United States,* 235 F.2d 573 (10th Cir. 1956). However, the fact that price parallelism exists becomes a significant factor and may help to support a finding of conspiracy where it is accompanied by evidence of behavior calculated to fix prices. A conspiracy must be judged by its constituent parts and the jury must look at the alleged conspiracy in its totality. A conspiracy may be implied by a course of conduct and other circumstantial evidence. *E. J. Delaney Corp. v. Bonne Bell, Inc.,* 525 F.2d 296 (10th Cir. 1975); *American Tobacco Co. v. United States,* 147 F.2d 93 (6th Cir. 1944), *aff'd,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *United States v. Armour & Co.,* 137 F.2d 269 (10th Cir. 1943); *United States v. Wohl Shoe Co.,* 369 F.Supp. 386 (D.N.M.1974).

In the instant case, the plaintiffs did not rely on price parallelism alone to prove that Olson Farms and its alleged conspirators forced downward the price paid to Utah-Idaho egg producers. There was other evidence, which the jury apparently chose to believe, that representatives of Olson Farms and its co-conspirators had numerous meetings at Harman's Cafe, and that in addition thereto, there were constant telephone calls between the various conspirators, all in furtherance of the conspiracy to peg egg prices in the Utah-Idaho area. Also, there was certain documentary evidence, namely correspondence, between Gil Cochran, who was in charge of Olson Farms' operations in Utah, and his business superiors, which, in our view, was quite damaging to Olson Farms and amply permitted the inference that Olson Farms was acting in concert with others to depress the prices paid to Utah-Idaho egg producers. All in all, the evidence in our view was of such a nature as to require submission to the jury of the alleged section 1 violation. *See Standard Industries, Inc. v. Mobil Oil Corp.,* 475 F.2d 220 (10th Cir. 1973), *cert. denied,* 414 U.S. 829, 94 S.Ct. 55, 38 L.Ed.2d 63 (1973).

As concerns the section 2 violation, Olson Farms contends that there was insufficient evidence to show that it in any wise conspired or attempted to monopolize the relevant geographical egg market. In this regard there was a very definite difference of opinion as to just what constituted the relevant geographic market. The plaintiffs' position was that Utah and the southern part of Idaho constituted the relevant geographic market, and their evidence was designed to show monopoly power in that particular area. Olson Farms, on the other hand, contended that the relevant geographic market included southern California in addition to Utah and southern Idaho, and that there was no evidence that Olson Farms exercised monopoly powers in this broadened geographic market. Olson urged inclusion of southern California in the market, because from time to time it served as a source of egg supply when there was a shortage of Utah eggs. Accordingly, argued Olson, there was a degree of correlation between the price paid egg producers in southern California and Utah. Such fact does not, in our view, necessarily mean that southern California was a part of the relevant geographical market. The trial court in effect submitted to the jury the question as to just what constituted the relevant geographical market, by instructing the jury that before any plaintiff could recover on a section 2 violation, such plaintiff must establish by a preponderance of the evidence that Olson Farms had monopolistic power in Utah and southern Idaho, and that absent such a showing there could be no recovery on the section 2 phase of the case. Under the facts of the case we find no error in the trial court's handling of this matter.

The relevant geographic market is seldom fixed by metes and bounds. *See United States v. Pabst Brewing Co.,* 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966). *Compare United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). In the case at hand, there was a difference of opinion as to what constituted the relevant geographic market, and in such circumstance it is best left to the plaintiff to establish by a preponderance of the evidence the area in which anti-competitive conduct has its impact. It was clearly proper to submit the issue to the jury.

With regard to the section 2 violation, Olson also contends that there was insufficient evidence to show a dangerous probability that Olson would monopolize the market in even the Utah-Idaho area, or that it possessed the necessary specific intent to do so. We think these issues were also properly submitted to the jury. Viewing the evidence in its entirety, it is clear that reasonable minds could find a violation of section 2 based upon a course of conduct and other circumstances which tended to show Olson's domination in the Utah-Idaho egg market, its intent to control the egg producer paying price and therefore dominate the market and the predatory means used to accomplish this purpose. *See American Tobacco, supra,* and *Union Carbide & Carbon Corp. v. Nisley,* 300 F.2d 561 (10th Cir. 1961).

In sum, then, we find no error in the trial court's submission of these alleged antitrust violations to the jury. Conspiracies to fix prices or monopolize or attempt to monopolize in a given geographical area are generally established by the facts and circumstances of the entire case, and are seldom established by direct evidence of the eyewitness variety. In the instant case, it would have been error for the trial court to have directed a verdict for Olson Farms.

## II. Damages

Olson Farms initially contends that there was no evidence that any of the several plaintiffs sustained any damage as a result of any possible antitrust violations by Olson Farms and its alleged co-conspirators, be it under section 1 or 2, and that accordingly, it was error for the trial court to submit the case to the jury.

█ We agree that an essential of the plaintiffs' antitrust claim is proof of some resultant economic damage; in fact, proof of economic damage to their "business or property" is a necessary precondition to their recovery of treble damages under the Clayton Act. 15 U.S.C. § 15; *see Areeda, Antitrust Violations Without Damage Recoveries,* 89 *Harv.L.Rev.* 1127 (1976). We think there was sufficient evidence of the *fact* that the plaintiffs did sustain some damage since there was ample statistical data and expert testimony describing depressed producer prices and the necessary concomitant—lost profits. As to the *quantum* of damage, the plaintiffs were under no burden to establish it with mathematical precision so long as the extent of such damage was not left to jury speculation. *Continental Baking Co. v. Old Homestead Bread Co.,* 476 F.2d 97 (10th Cir. 1973); *Story Parchment Co. v. Paterson Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690 (5th Cir. 1975). Without itemizing the testimony bearing on the damage question, our study of the voluminous record, consisting of some 7,500 pages of testimony, convinces us that the state of the record is such as to permit the jury to find and infer that the plaintiffs did suffer legal injury.

█ Olson Farms also attacks the verdicts returned by the jury, contending that the several verdicts are internally inconsistent and should not be permitted to stand. The special verdicts submitted to the jury were perhaps a bit unusual, and deserve some comment. When the case was submitted to the jury, three alternative grounds for recovery were made available. The first was a section 1 violation of the Sherman Act involving a conspiracy to restrain trade. In connection therewith the jury was instructed that if they found the issues in favor of an individual plaintiff and against Olson Farms, they should write a "yes" opposite the name of the particular plaintiff in whose favor they were finding.

If they did not find for a particular plaintiff, the jury was instructed to write "no" opposite such plaintiff's name. If the jury found for a plaintiff, they were further instructed to enter the "total amount of proximately resulting damages, if any, that said plaintiff is entitled to by plaintiff's name." The jury wrote "yes" in front of each of the fourteen plaintiffs and awarded damages to four of the fourteen plaintiffs totaling $113,469.

Another portion of the special verdict related to the conspiracy to monopolize violation under section 2 of the Sherman Act. Again were listed the names of the individual plaintiffs and again the jury was instructed to write "yes" or "no" by each name, depending upon whether or not they found in favor of a particular plaintiff. The jury wrote "yes" in front of the name of each of the fourteen plaintiffs. Concerning damages, the jury was instructed that if they had awarded any plaintiff damages under the section 1 violation, they should not award such plaintiff additional damages under the section 2 violation. If, however, a particular plaintiff had not been awarded any damage under the section 1 claim, and the jury had found, as to a particular plaintiff, that there was a section 2 violation, then the particular plaintiff could be awarded damages under the section 2 claim. In line therewith the jury proceeded· to award damages to the ten plaintiffs who had not been awarded damages under the section 1 claim. Damages thus awarded these ten plaintiffs totaled $461,124.

To round out the verdict picture, although it has no particular bearing on this present appeal, the third portion of the special verdict related to a section 2 claim based on an attempt to monopolize. Such related to the claims of four plaintiffs only. In this connection the jury wrote "yes" in front of the name of each of the names of the four plaintiffs listed in the verdict, but awarded no damages since each of the four had already been awarded damages under either the restraint of trade claim or the claim based on a conspiracy to monopolize.

Other instructions to the jury clearly indicated that the gravamen of each of the plaintiffs' first two claims, namely, the restraint of trade violation under section 1, and the conspiracy to monopolize under section 2, was that as a result of such activity the price of eggs paid by Olson Farms and other egg distributors to egg producers was fixed and depressed. In other words, whether Olson Farms be found guilty of restraint of trade or conspiracy to monopolize, or both, the resulting damage was the same, namely, fixed and depressed prices paid to egg producers for their eggs.

As indicated, then, in this setting the jury found that Olson Farms had been guilty of a restraint of trade violation of section 1 of the Act, as well as a conspiracy to monopolize violation of section 2, as to each of the fourteen plaintiffs. "Yes" was placed opposite the name of each plaintiff as concerns both alleged violations of the Act. Does the fact that the jury awarded four plaintiffs damages under the first claim, and awarded the remaining ten plaintiffs under the second claim, render the verdicts inconsistent? We think not.

There is the suggestion that since the jury did not award ten of the plaintiffs any damages under the plaintiffs' first claim based on restraint of trade, the jury in effect found that none of these ten had in fact sustained any damage. Accordingly, assert counsel, it was inconsistent for the jury to turn around and award damages to these ten plaintiffs under their second claim based on a conspiracy to monopolize. The mere fact that the jury did not affirmatively award damages to ten of the plaintiffs on the section 1 claim does not necessarily mean that the jury found no damages had been sustained with respect to those ten plaintiffs. Such reasoning is of course contradicted by the fact that the jury did award these ten plaintiffs damages on their second claim based on conspiracy to monopolize, which, as above indicated, resulted in fixed and depressed egg prices for egg producers. Additionally, it should be remembered that as concerns the first claim based on restraint of trade, the jury found in

favor of all fourteen plaintiffs and against Olson Farms on the liability issue, and, while awarding damages to four plaintiffs, left the damage blanks opposite the remaining ten plaintiffs blank. This is quite different from the verdict returned by the jury on Olson Farms' counterclaim, about which more will be said later. On Olson Farms' counterclaim the jury answered "no" as to liability, and also wrote in the word "none" as to the damage suffered by Olson Farms as a result of the alleged violation of antitrust law by the four plaintiffs against whom the counterclaim was directed.

In sum, then, on this particular matter it should be remembered that the jury affirmatively found that as concerns all fourteen plaintiffs, Olson Farms was liable to respond both on the basis of a restraint of trade violation as well as a conspiracy to monopolize violation. In line with the trial court's instruction that the individual plaintiffs could be awarded damages under either the first claim, or second, but not both, the jury awarded four plaintiffs damages under the first claim, and awarded damages to the remaining ten under the second claim. We do not find such to be inconsistent. In this regard we note that though there was considerable discussion prior to the time the instructions and forms of verdict were given the jury concerning the matter of instructions and forms of verdict, after the instructions and forms of verdict were given the jury, counsel for Olson Farms voiced no objections to the forms of verdict. Nor when the verdicts were returned and the jury polled, was there any suggestion that the verdicts were inconsistent or repugnant, one to the other.

### III. Instructions

■ Olson Farms contends that a new trial should be ordered on the basis of the instructions given the jury by the trial court. Complaint is made about instructions tendered and marked refused, as well as the instructions which were actually given the jury. It is said that the instructions as a whole were "weighted" in favor of the plaintiffs. We do not agree with this appraisal. Many of the instructions submitted by Olson Farms were given, in substance, by the trial court, though not in the precise language asked for. Without getting into a specific discussion as to the several instructions here under attack, it is sufficient to say that our study of the instructions, when considered as a whole, leads us to conclude that they were adequate and apprised the jury in understandable language of the rather complex issues which were being submitted. See *Gradsky v. Sperry Rand Corp.*, 489 F.2d 502 (6th Cir. 1973). There is no reversible error as concerns the instructions given, or refused.

### IV. Olson Farms' Counterclaim

■ As indicated, Olson Farms filed a counterclaim alleging that six of the fourteen plaintiffs were themselves guilty of antitrust violations. The underlying basis for the counterclaim was that these plaintiffs, and others, had at one time formed an egg council whose alleged purpose was to raise the prices being paid egg producers. The six plaintiffs thus charged with antitrust violations of their own, denied such activity, alternatively asserted that Olson Farms had sustained no injury from any possible activity on their part that might be deemed in violation of the Sherman Act, and that, in any event, such activity would be exempt from the antitrust laws under the provisions of the Capper-Volstead Act. 7 U.S.C. §§ 291, 292.

Olson Farms at the conclusion of all the evidence sought a directed verdict in its favor on the counterclaim. This request was denied and the trial court submitted to the jury all issues raised by the counterclaim. The jury returned a verdict which stated that none of the six plaintiffs was liable to Olson Farms. Additionally, the jury in its verdict found that *no* damage had been sustained by Olson Farms by virtue of any activity of the six plaintiffs.

In our view the trial court did not err in refusing to direct a verdict in favor of Olson Farms on its counterclaim. The issue of liability, or no, on the part of any of the

six plaintiffs to Olson Farms was for the jury. The fact that by the verdict we cannot now tell whether the jury found no predatory conduct, or that such conduct was exempt under the Capper-Volstead Act, is of no particular consequence, since the jury also found that Olson Farms had suffered no damage, in fact, as the result of any activity by these six plaintiffs. In no circumstances could Olson Farms recover on its counterclaim unless it in fact sustained some damage. The evidence is such as to amply permit the inference that any efforts by the six plaintiffs to raise the price paid to egg producers were totally ineffective. In fact, Olson Farms' Utah manager characterized the egg marketing council to be nothing but a "Mickey Mouse Club."

Finding no reversible error, we AFFIRM.