**PARAMOUNT FILM DISTRIBUTING CORPORATION; American Broadcasting-Paramount Theatres, Inc.; and Intermountain Theatres, Inc., Appellants,**

v.

**VILLAGE THEATRE, Inc., a Utah Corporation, Appellee.**

**No. 5002.**

United States Court of Appeals Tenth Circuit.

Dec. 9, 1955.

Rehearing Denied Jan. 30, 1956.

Before PHILLIPS, Chief Judge, HUXMAN, Circuit Judge, and SAVAGE, District Judge.

PHILLIPS, Chief Judge.

Village Theatre, Inc., brought this action against Paramount Film Distributing Corporation,[1] RKO Radio Pictures, Inc., United Paramount Theatres, Inc., now American Broadcasting-Paramount Theatres, Inc.,[2] and Intermountain Theatres, Inc.,[3] under §§ 4 and 16 of the Clayton Act,[4] seeking treble damages and an injunction, based on alleged violations of the anti-trust laws during a period from December, 1949, to October, 1952. The defendants below, other than RKO Radio Pictures, Inc., will be referred to hereinafter collectively as the defendants.

Paramount Film is a distributor of motion pictures. United is a theatre holding company and Intermountain is an exhibitor of motion pictures and the wholly-owned subsidiary of United.

The basic theory of the action, as originally commenced, was that Paramount Film, RKO Radio Pictures, Inc., another distributor, United and Intermountain agreed and conspired to deprive the Villa Theatre of the opportunity to play pictures on their first run exhibition and to play day and date pictures and to discriminate in favor of Intermountain and against the Villa Theatre in restraint of trade and commerce in the interstate distribution of motion picture films in Salt Lake City, Utah.

On the eve of the trial below, the action was dismissed as to RKO Radio Pictures, Inc. Thereafter, Village Theatre undertook to maintain the action on the theory of a vertical conspiracy among Paramount Film, United and Intermountain.

Salt Lake City is the center of a film exhibition area covering Utah, Idaho, Montana and parts of Wyoming and Ne-

Dennis McCarthy, Salt Lake City, Utah, and Milton Handler, New York City (Stanley D. Robinson, New York City, on the briefs), for appellants.

Joseph L. Alioto, San Francisco, Cal. (Maxwell Keith, San Francisco, Cal., and Elwood S. Kendrick, Los Angeles, Cal., on the brief), for appellee.

1. Hereinafter called Paramount Film.

2. Hereinafter called United.

3. Hereinafter called Intermountain.

4. 15 U.S.C.A. §§ 15, 26.

vada. It has six regular first run downtown theatres located in the heart of the city. Two of the downtown theatres, the Uptown and Rialto, are operated by Joseph L. Lawrence and his associates, who also operate the Villa Theatre. Downtown theatres Center, Utah and Capitol are operated by Intermountain. Downtown theatre Lyric is operated by Mr. Rosenfield. In addition, Studio, a small downtown theatre operated by Intermountain, on occasions exhibits first run pictures, but it is primarily a move-over house playing a continuation of first run pictures without an intervening clearance.

The Villa Theatre and the downtown theatres in Salt Lake City are in substantial competition.

At the trial the jury returned a verdict in the sum of $20,000. The court entered a judgment for $60,000, plus $27,500 attorneys' fees, and the costs. It also entered a decree for an injunction, but stayed the injunction pending appeal. The defendants have appealed.

A decree entered in the United States District Court for the Southern District of New York in 1946 required Paramount Pictures, Inc., to divorce its domestic theatre holdings from its production and distribution business by March 3, 1950.[5] On January 1, 1950, Paramount Pictures, Inc., transferred all of its theatres in the United States to United, which was an entirely new and independently controlled company, created for that purpose. All the stock of Intermountain was acquired by United. At the same time, Paramount Film became the sole distributor of Paramount Pictures in the United States and Paramount Pictures, Inc. was dissolved.

The Villa Theatre had modern equipment and appointments. It was situated in a suburban area in the southeast section of Salt Lake City, six and one-half miles from the downtown business district. It commenced operations on December 23, 1949. Shortly before its opening, George A. Smith, Western Division Manager of Paramount Film, and Frank Smith, Salt Lake Branch Manager of Paramount Film, made an inspection of the site and surrounding area of the Villa Theatre. No study was made of the population of the area or of population trends.

Primarily because of the location of the Villa Theatre, George A. Smith recommended to Edward K. O'Shea, Vice-President and Assistant Sales Manager of Paramount Film, that the Villa Theatre not be licensed to show first run Paramount Pictures. O'Shea adopted that recommendation.

On January 6, 1950, Smith wrote a letter to O'Shea setting forth "a list of the accounts in the Salt Lake territory that we are not serving." In Salt Lake City he listed the Villa, Rialto, Lyric and Southeast and stated the reason why each of such theatres was not being served was "This is an opposition situation to the Intermountain Theatres in Salt Lake which are using our product."

However, such letter is susceptible of a construction that it referred to prior licensing of pictures to Intermountain to the exclusion of other exhibitors, which, under the decree in United States v. Paramount Pictures, Inc., supra, Paramount Film had the right to do up to March 3, 1950.

In February, 1950, Paramount Film inaugurated a system of competitive bidding for its first run films in Salt Lake City. Uptown, Rialto, Center, United and Capitol Theatres were permitted to participate in such competitive bidding. Studio may have been permitted to participate in certain instances. It did show two first run pictures during the period in controversy.

Under such system, Paramount Film would issue a request for offers, stating the name of the picture to be released and the date the bids were due. Para-

5. See United States v. Paramount Pictures, Inc., D.C., S.D.N.Y. 1946, 66 F. Supp. 323, affirmed in part and reversed in part, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260. Opinion on remand, D.C., 85 F.Supp. 881.

mount Film reserved the right to reject all bids and to enter into negotiations for the licensing of the pictures. Paramount Film refused to permit the Villa Theatre to participate in such competitive bidding and also refused the Villa Theatre permission to run Paramount products on a day and date basis. In so doing, Paramount followed its general policy of distributing its first run films in large cities to downtown theatres, sometimes called the "showcase" method of distribution. However, such policy was not followed in all cities. For various reasons, Paramount's first run pictures were made available in suburban theatres in Portland, Los Angeles, Phoenix, Tucson, Pocatello and Albuquerque.

In support of the "showcase" distribution method, defendants below introduced evidence which tended to establish distinct advantages resulting from the first run exhibition of motion pictures in a large and finely appointed downtown theatre, as follows: More patrons are attracted to such downtown theatres than to suburban areas; the advertising on the marquee of the downtown theatres reaches many people and establishes the picture in the minds of many persons, even though they do not go to see the picture at the first showing; the downtown theatre has the benefit of "drop in" trade from hotels and shopping centers; the downtown theatres have better transportation facilities from all portions of the city than suburban theatres; a suburban theatre draws its patronage largely from the area in which it is located; where pictures are exhibited first run in well appointed downtown theatres, the rental rate to the film distributor, both from the first run exhibition and from subsequent exhibitions, will be greater. The showing of a picture in a downtown theatre, which has a large sphere of influence, not only in the city, but for a considerable distance, may be very advantageous and enhance the value of a picture over a wide area. On the other hand, a showing of a picture in a suburban theatre may injure it in a wide area.

In a letter dated February 2, 1951, from Paramount Film to its Branch Managers, Paramount Film set out the reasons stated above for its general policy of distributing first run pictures under a "showcase" method of distribution. It recognized, however, that there might be exceptions where a first run exhibition in a suburban theatre should be permitted and directed the Branch Managers to examine the facts, weigh the various factors and reach a conclusion.[6]

6. The letter in part read:

"The reasons for licensing a picture for first run showing in a downtown theatre and on later runs in suburban theatres are therefore clear.

"However, in the last two or three years, the suburban theatre exhibitor, who is concerned only with his own theatre, has demanded pictures first run. He claims he can pay as much or more film rental than the downtown theatre and offers longer playing time.

"We must examine the facts in each case, compare the theatres, i. e., the suburban theatre with the downtown theatre, their respective seating capacities; their respective physical appointments; the relationship of the suburban community to the downtown section of the city. You will also consider what the transit facilities are and what other attractions there are to draw people downtown. You will take into consideration the number of theatres there are in that city and what *effect* the showing of a picture first run in a suburban theatre will have on those other theatres. Also, how will your revenue be affected in that city from all the theatres as a whole. The showing of a picture in a downtown theatre, which may have a large sphere of influence, not only in the city but for a considerable distance, may be very advantageous and enhance the value of a picture over a wide area. On the other hand, the showing of it in a suburban theatre may injure it in a wide area.

"No two situations are the same and you will weigh the various factors and reach a conclusion as to whether you will or will not license first run in a suburban theatre. In some cases the fact will be so strong that you know the answer without experiment."

During the period in which the conspiracy was alleged to exist, the Villa Theatre had access through competitive bidding to the first run products of all the major distributors, except Paramount Film and RKO Radio Pictures, Inc. On occasion some of these distributors would grant the Villa Theatre an exclusive first run, but most of the time they licensed the Villa Theatre day and date with either the Uptown or Rialto. Beginning in April, 1953, RKO Radio Pictures, Inc. permitted the Villa Theatre to compete for first run pictures.

The defendants introduced evidence which tended to establish that Paramount Film, under the "showcase" method of distribution, realized a substantially large average film rental than that realized by other major distributors, who permitted the Villa Theatre to bid for first run pictures.

In 1950, 3 Paramount first run pictures were awarded to Uptown and Rialto and 25 were awarded to Intermountain.[7] In 1951, 2 Paramount first run pictures were awarded to Uptown and Rialto Theatres; 27 to Intermountain and 2 to others. In 1952, Paramount Film awarded 3 of its first run pictures to Uptown and Rialto. Intermountain was awarded 20 first run pictures and 2 were awarded to other theatres.

During the years 1951 and 1952, inclusive, Uptown and Rialto were awarded 5 percentage pictures and Intermountain was awarded 66 percentage pictures distributed by Paramount Film.

The Villa Theatre offered evidence which tended to show that pictures were tentatively awarded to Intermountain prior to bid due dates; that negotiation for pictures took place between Paramount Film and Intermountain prior to notification of the pictures' availability to Intermountain's competitors; that information about pictures in advance of offers for bids was given to Intermountain and not given to other theatres in Salt Lake City; that higher offers of the Villa Theatre for first run pictures were ignored; that at times special rental concessions were allowed Intermountain; and that pictures were negotiated by United to Intermountain on a circuit basis.

However, the defendants introduced evidence which tended to establish that United made the highest and best bid for pictures which were awarded to it and that the Villa Theatre was not permitted to bid for first run pictures, because it was a suburban theatre and Paramount Film believed the "showcase" method of distribution was preferable and would result in greater rental returns to Paramount Film.

Section 1 of the Sherman Act, 15 U.S. C.A. § 1, in part reads:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: * * *."

The defendants assert that the trial court erred in denying their motions for a directed verdict in their favor, interposed at the end of the Villa Theatre's case in chief and at the end of all the evidence.

The defendants contend that at most the evidence established that the defendants for sound business reasons, elected to license the first run pictures in Salt Lake City to the downtown theatres and refused to license them to the Villa Theatre and that they had a lawful right so to do.

■ It is well established that a person engaged in an entirely private business has the right to select his own customers, and, exercising an independent discretion, he may sell or refuse to sell to a particular customer.[8] However,

7. However, approximately 16 of such pictures had been awarded to Intermountain before February, 1950.

8. United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992.

the right is not absolute.[9]  In Times-Picayune Pub. Co. v. United States, 345 U.S. 594, at page 625, 73 S.Ct. 872, at page 889, 97 L.Ed. 1277, the court said:

"  *   *   *  Beginning with United States v. Colgate & Co., 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, this Court's decisions have recognized individual refusal to sell as a general right, though 'neither absolute nor exempt from regulation.' Lorain Journal Co. v. United States, 1951, 342 U.S. 143, 155, 72 S.Ct. 181, 187, 96 L.Ed. 162.  If accompanied by unlawful conduct or agreement, or conceived in monopolistic purpose or market control, even individual sellers' refusals to deal have transgressed the Act.  Lorain Journal Co. v. United States, supra; United States v. Bausch & Lomb Optical Co., 1944, 321 U.S. 707, 721–723, 64 S.Ct. 805, 812–813, 88 L.Ed. 1024;  Eastman Kodak Co. [of New York] v. Southern Photo Materials Co., 1927, 273 U.S. 359, 375, 47 S.Ct. 400, 404, 71 L.Ed. 684;  United States v. Schrader's Son, Inc., 1920, 252 U.S. 85, 99, 40 S.Ct. 251, 253, 64 L.Ed. 471;  cf. American Tobacco Co. v. United States, 1946, 328 U.S. 781, 808, 66 S.Ct. 1125, 1138, 90 L.Ed. 1575;  Federal Trade Commission v. Beech-Nut Packing Co., 1922, 257 U.S. 441, 453–455, 42 S.Ct. 150, 154–155, 66 L.Ed. 307."

■  So, in the instant case, if Paramount Film entered into an agreement, express or implied, with United and Intermountain to favor Intermountain in the distribution of first run pictures and to deny the Villa Theatre the right to bid for first run pictures and to show day and date pictures, for the purpose of suppressing the competition of the Villa Theatre with Intermountain and to unreasonably restrain trade or commerce in first run pictures in the Salt Lake City area, such agreement was unlawful and actionable.

While the question is close, we are of the opinion that the evidence, considered in the light most favorable to the Villa Theatre, and the inferences which might reasonably be drawn therefrom, presented an issue of fact for the determination of the jury as to whether there was an illegal agreement among Paramount, United and Intermountain, which violated the anti-trust laws.

The mere agreement among Paramount Film, United and Intermountain that films were to be distributed to Intermountain and other downtown theatres on a competitive bidding basis, to the exclusion of the Villa Theatre, was not in itself per se unlawful.  It presented an issue of fact as to whether there was an unreasonable restraint of trade and that issue should have been submitted to the jury,[10] as requested by tendered instruction of the defendants.

In its charge to the jury, the court submitted the issue of monopoly.  The scope of the issues agreed on at the pre-trial conference did not include the issue of monopoly.  We think there was no proof of monopoly.  We think the only issue was whether there was an unlawful and unreasonable restraint of trade, as stated above.  That issue and that issue alone should have been submitted to the jury.

■■  The trial court, over the objection of defendants, permitted the introduction of the decree in United States v. Paramount Pictures, supra.  That action involved a conspiracy which had terminated prior to the time the conspiracy charged in the instant case was alleged to have commenced.  Of the

9.  Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 625, 73 S.Ct. 872, 97 L.Ed. 1277; Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 452, 453, 42 S.Ct. 150, 66 L.Ed. 307; William Goldman Theatres v. Loew's, Inc., 3 Cir., 150 F.2d 738, 742, 743; Webster Motor Car Co. v. Packard Motor Car Co., D.C., 135 F.Supp. 4.

10. United States v. National Football League, D.C.Pa., 116 F.Supp. 319, 323; Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619.

plaintiff and defendants in the instant case, only Paramount Film was a party to such action. Section 5 of the Clayton Act, 15 U.S.C.A. § 16, provides that such a decree shall be prima facie evidence "as to all matters respecting which such judgment or decree would be an estoppel as between the parties thereto." Admissibility must be determined by a reference to the principles of estoppel.[11] We can find no issue adjudicated in the Paramount decree which would be material to any issue in the instant case, or would constitute an estoppel as against any party to the instant case.[12] We conclude that the trial court committed prejudicial error in admitting such decree.

By its injunctive decree the trial court prohibited Paramount Film from licensing its pictures, other than for multiple, simultaneous exhibitions in each of two zones specified in the decree. The result of the zoning is that the downtown theatres are all in one zone and the only major theatre in the other zone is the Villa Theatre. Thus, in fact, the decree gives the Villa Theatre the right to all Paramount films on first run, without clearance between it and other competing theatres.

In the event that on a retrial the Villa Theatre prevails, we are of the opinion that the court would not be warranted in entering an injunctive decree, such as it heretofore entered. Such a decree more than removes the effects of the alleged conspiracy, should it be established. It actually gives the Villa Theatre a positive competitive advantage. It should go no further than to put the parties in the position they would enjoy if no conspiracy had existed.[13]

Since the judgment is to be reversed, we deem it unnecessary to pass upon the contention that the attorneys' fees allowed were excessive.

The judgment is reversed and the cause remanded, with instructions to grant the defendants a new trial.

---

11. Loew's, Inc., v. Cinema Amusements, Inc., 10 Cir., 210 F.2d 86, 90, certiorari denied 347 U.S. 976, 74 S.Ct. 787, 98 L.Ed. 1115.

12. See United Shoe Machinery Corp. v. United States, 258 U.S. 451, 458, 459, 42 S.Ct. 363, 66 L.Ed. 708.

13. Loew's, Inc., v. Milwaukee Towne Corp., 7 Cir., 201 F.2d 19, 23, certiorari denied 345 U.S. 951, 73 S.Ct. 865, 97 L.Ed. 1374.