**E. J. DELANEY CORPORATION, and Ski Kit, Inc., Plaintiffs-Appellees,**

v.

**BONNE BELL, INC. and Jess Bell, Defendants-Appellants.**

No. 74–1751.

United States Court of Appeals, Tenth Circuit.

Argued July 8, 1975.

Decided Nov. 11, 1975.

Certiorari Denied March 29, 1976.

See 96 S.Ct. 1501.

Sidney Dickstein, Washington, D. C. (Alan Pick, Washington, D. C., and Jack D. Henderson, Denver, Colo., on the brief), for plaintiffs-appellees.

Frank Seth Hurd, Cleveland, Ohio (Mark O'Neill and Jason C. Blackford, Cleveland, Ohio, on the brief, Robert H. Harry, Denver, Colo., of counsel), for defendants-appellants.

Before SETH, McWILLIAMS and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Bonne Bell, Inc. (Bonne Bell) and Jess Bell (Bell), president of Bonne Bell,[1] appeal an adverse jury verdict based on violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2.[2]

Bonne Bell is an Ohio corporation engaged in the manufacture and sales of toiletries and cosmetics throughout the United States. In 1966 Bonne Bell initiated a "total involvement" to establish its cosmetics in the ski market. This involvement included advertising to the skiing market via ads. placed on the weather stations of Delaney Corporation, plaintiffs-appellees.

During the latter part of 1968, Bonne Bell entered into a contract, amended January 9, 1969, with the United States Ski Association (USSA) under which Bonne Bell was accorded the exclusive United States Ski Team (Ski Team) endorsements for its cosmetic products and beauty aids. This contract designated Bonne Bell as the official cosmetic of the Ski Team.

The contract provided, inter alia, that: Bonne Bell would have the exclusive right to utilize the Ski Team endorsement for all of its cosmetic products and beauty aids provided they had first been examined and approved by the USSA; Bonne Bell would provide reasonable quantities of its products for the personal use of members of the Ski Team; Bonne Bell would pay a yearly minimum retainer of between $25,000 and $50,000; and that Bonne Bell would pay a royalty of two tenths of one percent (.2%) of the total value of the goods shipped under the agreement. In addition, the contract provided that the USSA would work with Bonne Bell to promote the sale and acceptance of its products.

By the latter part of 1970 Bonne Bell had established its products in the ski market. Bonne Bell's advertising director related to Delaney Corporation's president at a December 14, 1970 meeting:

We have worked very hard to get a hold on the ski market, and Jess Bell doesn't want any competition in that market.

Delaney Corporation was organized in 1964 by E. J. Delaney (Delaney) in an effort to bring advertising from national advertisers to the ski market by way of weather station advertising displays located in ski resort areas. The "stations" were generally four feet high and seven feet long, equipped with "instrumentation such as wind direction, wind velocity, meters, temperature, barograph, which records barometric pressure, and a

---

1. Hereinafter collectively referred to as appellants.

2. 15 U.S.C.A. § 1 provides in part:
 Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: *Provided*, That nothing contained in sections 1 to 7 of this title shall render illegal, contracts or agreements . . . .
 15 U.S.C.A. § 2 provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

little chart to interpret what you read." The stations included bulletin boards for posting trail conditions, upcoming events, and ski activity. They were "surrounded by back lighted advertisements" which were sold to advertisers. By 1970 Delaney Corporation was a profitable enterprise with sixty (60) weather stations located throughout the United States. Its advertisers at that time numbered many national accounts including Bonne Bell.

During its initial years of operation Delaney Corporation distributed samples of its advertisers' products to ski shops in the areas where it operated, without additional charge by Delaney Corporation. By 1970 Delaney Corporation had contracted with a number of suppliers for the distribution of their samples via a "skiers-pak" which included, among other items, cosmetics and toiletries, whereby Delaney Corporation was paid a set fee by each supplier for each "pak" distributed.

In an effort to assure distribution of the sample "paks", Delaney Corporation contacted the National Ski Area Association and the USSA. It proposed to the USSA that each "pak" sell for one dollar and that 40% of the total receipts be remitted to the Ski Team. After the "skiers-pak" proposal was presented to the Board of the United States Ski Foundation, the fund raising segment of the USSA, it was approved subject to approval by the Foundation's auditors and the International Merchandising Corporation which supervised the Ski Team's endorsement program.

When questioned relative to the distribution of the "skiers-pak", Bonne Bell voiced its objection to the promotion of cosmetics and beauty aids in a manner suggestive of the USSA's endorsement, in view of its exclusive endorsement contract with USSA. Bonne Bell's position, essentially, was that it did not object to the distribution of the "pak" if it did not contain cosmetics or toiletries or if the distribution was made without reference to or indication of an endorsement from USSA.

Thereafter, even though Delaney Corporation had mailed out between "70,000 and 80,000" fliers advertising its "pak" to ski shops, ski areas, ski patrols, and ski clubs, relating that the net proceeds of the "pak" sales would go to the Ski Team, and although it had modified its proposal to USSA, the Foundation voted not to accept the "pak" proposal. Delaney Corporation later distributed approximately 23,000 "paks" by means of an agreement entered into with the United States Olympic Committee.

Delaney Corporation brought suit against Bonne Bell and its president [3] on July 30, 1971, alleging, inter alia, that: USSA had made many endorsement and promotional contracts with numerous commercial enterprises; a USSA endorsement has a unique value for the sale of products in the ski market; in return for a guaranteed annual payment and a percentage of sales to USSA, Bonne Bell was allowed the exclusive right to utilize the Ski Team endorsement in connection with its cosmetic products and beauty aids; Delaney Corporation's "Skiers Holiday Pak" which contained health, toilet, and food items of use to skiers was initially unanimously endorsed by the Foundation Board subject to approval; the "skiers-pak" was a profit-sharing promotion which did not contain any endorsement of the Ski Team; based on the Board's initial approval, Delaney Corporation arranged for the distribution of the paks; thereafter Bonne Bell and other individuals combined and conspired with the USSA and its Foundation Board to cause them to refuse to further deal with Delaney Corporation; and, the actions of Bonne Bell were violative of the anti-trust laws of the United States, creating and resulting in an unreasonable restraint of trade and commerce and an unlawful combination and conspiracy in restraint of trade and commerce in sales to skiers of cosmetic, health, and toilet items.

---

3. Several officers of USSA were initially named, but they were dropped prior to trial.

Trial was to a jury. Delaney Corporation was awarded a general verdict of $159,063.50, which was trebled, together with the Court's allowance of attorney fees of $48,850.00 to Delaney Corporation pursuant to 15 U.S.C.A. § 15. Bonne Bell filed several post-trial motions, including a motion for judgment notwithstanding the verdict (n. o. v.) or, in the alternative, for a new trial, and for assessment of reasonable attorney fees, each of which were denied.

In denying these motions and upholding the jury verdict, the Trial Court initially held, inter alia, that: Section 1 of the Sherman Act is directed at the *means* of illegal conspiracies in restraint of trade; Section 2 of the Act is aimed at outlawing the *ends* of anti-competitive behavior; and that the purpose of the two sections is to prohibit monopolization and lesser forms of anti-competitive behavior which unreasonably restrain commerce. The Court further held that the jury could have reasonably found that: the relevant market was the ski market; Bonne Bell acted with others to extend the operation of the endorsement agreement beyond its legitimate effects; *a dangerous probability of monopolization existed, even absent specific proof of Bonne Bell's market power*; Delaney Corporation had a business or property interest which was damaged by Bonne Bell; and that Delaney's inability to distribute was a result of appellants' conduct and was not caused by some other, unrelated condition.

On appeal appellants contend that: (1) they are entitled to a judgment as a matter of law with respect to appellee's claim that they violated § 1 of the Sherman Act; (2) appellee failed to present sufficient evidence in proof of a violation of Section 2 of the Sherman Act; (3) a new trial should be ordered; and (4) the Trial Court erroneously instructed on the relevant market.

## I.

Appellants contend that they are entitled to judgment as a matter of law with respect to appellees' claim that they conspired or combined to restrain its trade in violation of § 1 of the Sherman Act. They note that appellees conceded that the exclusive endorsement contract was not illegal per se and that in order to prove a § 1 claim appellees must offer evidence from which "reasonable minds might conclude that Bonne Bell and Jess Bell conspired or combined—to restrain, unlawfully, Delaney's lawful trade." Appellants argue that appellees did not prove a conspiracy or combination, that the contract was not intended to nor could it affect competition or market structure or normal economic forces in the cosmetic and beauty aid market, and that even had the Board voted against appellees' promotion solely because of the endorsement contract and Bonne Bell's objections, that these actions could not be held to be an unlawful restraint of trade nor could they be deemed violative of § 1, *supra*.

In denying appellants' motions for a directed verdict and judgment n. o. v. on the § 1 claim, the Trial Court found that:

Defendant contends that the evidence cannot support any inference of their (sic) participation in a conspiracy in restraint of trade. ___ Although the endorsement agreement ___ is not a per se violation ___ it is not unreasonable for the jury to view the sequence of events from late 1970 until the spring of 1971 as evidence of an on-going conspiracy. ___ The defendant's assertion of its admittedly valid contractual rights did not occur in a vacuum, but rather in the specific context of Delaney's proposals to USSEF. The jury might well have found that Bonne Bell, in concert with agents of USSEF, acted *to extend the operation* of the endorsement agreement beyond its legitimate effects. ___ It was quite reasonable for the jury to conclude (1) that Bonne Bell used their exclusive endorsement contract and other means with the intended effect of keeping Delaney out of the relevant market; and (2) that agents of USSEF understood and acquiesced in that purpose.

Such conclusions permit the ultimate findings of a *combination* to suppress competition.

Finally, defendants emphasize that all the evidence adduced at trial has a non-conspirational explanation. In no precedent cited by defendants or discovered by the court's own research has the possibility of innocent motive prevented the inference of conspiracy, where such inference was otherwise reasonable.

■ We observe, preliminarily, that the purpose of awarding treble damages to private parties was *not merely* to provide private relief, but to serve as an incentive to encourage the high purpose of enforcement of the antitrust laws. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Semke v. Enid Automobile Dealers Association*, 456 F.2d 1361 (10th Cir. 1972).

We have held, as contended by appellants, that a manufacturer may select customers to whom he will sell so long as his conduct has no monopolistic or market control purpose. *Adolph Coors Company v. Federal Trade Commission*, 497 F.2d 1178 (10th Cir. 1974), cert. denied 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975); *Colorado Pump & Supply Company v. Febco, Incorporated*, 472 F.2d 637 (10th Cir. 1973), cert. denied 411 U.S. 987, 93 S.Ct. 2274, 36 L.Ed.2d 965 (1973).

■■ The exclusive endorsement contract, albeit valid on its face, did present an issue of fact to be determined by the jury, to-wit: whether the exclusive endorsement, on the basis of the facts presented, established a Section 1 violation. *Paramount Film Distributing Corporation v. Village Theatre, Inc.*, 228 F.2d 721 (10th Cir. 1955). We have recognized that in making such a determination the jury is entitled to considerable latitude:

\* \* \* it is not necessary in a case of this kind that there be direct evidence of the existence of a conspiracy of the kind charged in the complaint.

More often than otherwise, direct evidence of such a conspiracy is not available. But it may be proved by a development and collation of the circumstances. It may be inferred from the things said and done. *Eastern States Retail Lumber Dealers' Association v. United States*, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490; *Bordonaro Bros. Theatres v. Paramount Pictures*, 2 Cir., 176 F.2d 594.

*Loew's, Inc. v. Cinema Amusements*, 210 F.2d 86 (10th Cir. 1954) at page 93, cert. denied 347 U.S. 976, 74 S.Ct. 787, 98 L.Ed. 1115 (1954).

The character and effect of a conspiracy is not to be judged by viewing its separate parts, but only by looking at it as a whole. *United States v. Armour & Co.*, 137 F.2d 269 (10th Cir. 1943). It is also clear that conspiracies may be implied from a course of dealing and other circumstances. *American Tobacco Co. v. United States*, 147 F.2d 93 (6th Cir. 1944), aff'd, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *United States v. Wohl Shoe Company*, 369 F.Supp. 386 (D.N.M.1974).

■ Applying these standards to the facts of this case, we hold that there is sufficient evidence from which the jury could have found that appellants conspired to prevent appellees' distribution of their "skiers-pak". It is undisputed that in 1966 appellants initiated a "total involvement" to establish their cosmetics in the ski market, and that by late 1970 they believed that they had a "hold" on that market; they were opposed to all competition; and that although the Foundation Board was enthusiastic upon its initial review of the "skiers-pak" proposal as a fund-raising promotional, thereafter, when objections were lodged by Bonne Bell, the Board refused to endorse the "pak" as a fund raiser. The jury was entitled to find that as a result of appellants' actions, appellees were precluded from distributing its "skiers-pak" even though the pak was a promotionally oriented fund raising device which, although it included the distribu-

tion of cosmetics and toiletries to the skiing market, did not purport to carry the endorsement of USSA. In light of these facts, the jury could reasonably conclude that appellants' exclusive endorsement contract was utilized in an illegal conspiracy in the restraint of trade, violative of 15 U.S.C.A. § 1, *supra.*

## II.

Appellants contend that appellees failed to produce evidence from which the jury might infer all of the necessary elements of the offense of attempting to monopolize prohibited by § 2 of the Sherman Act, and that, accordingly, they are entitled to judgment as a matter of law on that issue. Appellants argue that a § 2 violation requires showing a sufficient economic power in a relevant market to create a dangerous probability that the intended monopolization will succeed.

Appellees tendered and the Trial Court admitted in evidence their (Plaintiffs' below) Exhibits 84 and 84A, which in summary, reflect: (a) For the period February 1, 1970 through June 30, 1971, a profit, after selling expenses, from 200,000 Skiers Holiday Paks of $54,234.00 and a net profit from the same sales of $27,435.72; and (b) a net loss for the period February 1, 1970 through November 30, 1972 of $199,084.58, and a net loss for the period ending September 30, 1973 of $222,085.49.

In holding that a § 2 violation had been established, the Trial Court held that the jury could have reasonably found: that the "pak" was a collection of cosmetics, purchased as a unit; that it was uniquely designed for skiers; and that for the purpose of examining the competitive effects of appellants' actions, the ski market was the relevant market, being separate and distinct from the national cosmetic market. The Trial Court further found that since the evidence permitted a reasonable inference of a substantial restraint of trade that the jury could have found a dangerous probability of monopolization, *even absent*

specific proof of Bonne Bell's market power. We respectfully disagree.

There are many statutes and regulations, both federal and state, touching the nervous system of our national competitive economic order. Courts must guard against impeding competitive rigors. The prime concern of the statutory framework and the role of the courts is not that of shackling competition, but rather that of prohibiting restraints thereon. *Cole v. Hughes Tool Company*, 215 F.2d 924 (10th Cir. 1954). The admonition of the Supreme Court as set forth in *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), relating to the prohibitions of the Sherman Act is, we believe, worthy of note:

> Restraints on competition or on the course of trade in the merchandising of articles moving in interstate commerce is not enough, unless the restraint is shown to have or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition.

310 U.S. 469 at 500–501, 60 S.Ct. at 996.

Thus our concern cannot involve the theoretical joust between regulation and competition, but rather whether the record before us on appeal dictates and justified the imposition of the controls and sanctions of the federal anti-trust statutes.

We have held that an aggrieved party alleging violations of the Clayton Act cannot rest on the proof of a wrong [unlawful merger] which does not demonstrate any direct connection with the injury he complains of and that proof of illicit acts, in the context of anti-trust violations looking to damages for injuries allegedly suffered, may not be sufficient to establish the nexus required. *Reibert v. Atlantic Richfield Company*, 471 F.2d 727 (10th Cir. 1973), cert. denied 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973). It is fundamental that one

invoking the treble damage proviso of the Sherman Act must prove actual injury by reason of anti-trust infractions in order to recover. When dealing with the imposition of treble damages, liberality of proof is, at best, a most questionable quantum. In this respect we are well aware of the recent pronouncement of the Supreme Court on the burden of proof required to sustain an anti-trust judgment. In *Zenith Radio Corporation v. Hazeltine Research, Inc., supra*, the Court said:

> Zenith's evidence, although by no means conclusive, was sufficient to sustain the inference that Zenith had in fact been injured to some extent [9]

[9] Zenith's burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage. It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, supra [370 U.S. 690], at 702 [82 S.Ct. 1404, at 1412, 8 L.Ed.2d 777] (1962); *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 143–144 [88 S.Ct. 1981, 1986–1987, 20 L.Ed.2d 982] (1968) (concurring opinion).

> by the Canadian pool's restraints upon imports of radio and television sets. 395 U.S. 100 at 114, 89 S.Ct. at 1571.

Trial and appellate courts alike must also observe [beyond compliance and deference to Rule 52(a)] the practical limits of the *burden of proof* which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the factfinder may "conclude as a matter of just and reasonable inference from the proof of the defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices,

profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs." *Bigelow v. RKO Pictures, Inc.*, supra [327 U.S. 251], at 264 [66 S.Ct. 574, at 579, 90 L.Ed. 652]. See also *Eastman Kodak Co. v. Southern Photo Materials Co. of New York*, 273 U.S. 359, 377–379 [47 S.Ct. 400, 404–405, 71 L.Ed. 684] (1927); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 561–566 [51 S.Ct. 248, 250–251, 75 L.Ed. 544] (1931). (Emphasis supplied).

395 U.S. 100, 123, 124, 89 S.Ct. at 1576.

■ And while it is well established that a fact-finder is not entitled to base a judgment on speculation or guesswork, the jury may make a just and reasonable estimate of the damage based on relevant data and render its verdict accordingly. In such circumstances, juries are allowed to act upon probable and inferential, as well as direct and positive proof. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Eastman Kodak Company of New York v. Southern Photo Materials Company*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927).

*Zenith Corp., supra,* followed *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946), wherein the Court noted:

> In each case we held that the evidence sustained verdicts for the plaintiffs, and that in the absence of more precise proof, the jury could conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs. In this we but followed a well settled principle. See *Hetzel v. Baltimore & Ohio R. Co.*, 169 U.S. 26, 38–9 [18 S.Ct. 255, 259, 260, 42 L.Ed. 648]. The tortious acts

had in each case precluded ascertainment of the amount of damages more precisely, by comparison of profits, prices and values as affected by the conspiracy, with what they would have been in its absence under freely competitive conditions. Nevertheless, we held that the jury could return a verdict for the plaintiffs, even though damages could not be measured with the exactness which would otherwise have been possible.

In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances "juries are allowed to act upon probable and inferential as well as [upon] direct and positive proof." *Story Parchment Co. v. Paterson Parchment Paper Co., supra* [282 U.S.], 561–4 [51 S.Ct. (248) 250, 251, 75 L.Ed. 544]; *Eastman Kodak Co. v. Southern Photo Material Co., supra* [273 U.S.], 377–9 [47 S.Ct. 400, 404, 405, 71 L.Ed. 684]. Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery.

The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. See *Package Closure Corp. v. Sealright Co.* [2 Cir.], 141 F.2d 972, 979.

327 U.S. at pp. 264, 265, 66 S.Ct. at p. 579.

In handing down his post-trial rulings in the case at bar, it is clear that the learned and conscientious Trial Judge relied upon *Denver Petroleum Corporation v. Shell Oil Company,* 306 F.Supp. 289 (D.Colo.1969):

While there is no need now to go into the specific deficiencies of the evidence in this regard, the applicable principles should be stated. The rule has long been established in antitrust cases that where the fact of damage caused by a defendant's wrong is established with certainty, the fact that such damage is uncertain as to amount is no obstacle to recovery and a just and reasonable estimate should be made. *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Kobe, Inc. v. Dempsey Pump Co.,* 198 F.2d 416 (10th Cir.), *cert. denied,* 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651 (1952). But it is equally true that "the amount of damages may not be based upon mere speculation and conjecture." *Kobe, Inc. v. Dempsey Pump Co., supra,* at 426 (citing *Story Parchment*). Especially pertinent is the decision in *Delaware Valley Marine Supply Co. v. American Tobacco Co.,* 184 F.Supp. 440 (E.D.Pa.1960). The court in that case was faced, as is the Court here, with the hypothetical profit calculation of a private antitrust plaintiff claiming standing under efforts to enter a business. After analyzing the profit calculation, in granting judgment for the defendant the court made the following statement in which we concur:

[D]espite judicial liberality in accepting minimal proof of damage in an anti-trust case, the rule persists that any damage estimate * * * must be "just and reasonable" and not based on "speculation or guesswork". No damage verdict could be rendered upon the evidence in the present case without doing violence to this inexorable requirement. 184 F.Supp. at 448 (Citation omitted).

306 F.Supp. at 309.

■ Notwithstanding the liberal rules above discussed relating to the evidence requisite to establish a cause for antitrust damage award, a necessary element of proof required to establish a prima facie case of violation of § 2 of the Sherman Act is that of *specific intent to monopolize. Swift & Company v. United States*, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905). See also *United States v. Griffith*, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948).

The Supreme Court has not yet expressly held that there must also be proof of a "dangerous probability" of success (with an attendant market description and proof of market power of the defendant), or whether intent alone is enough with whatever description of the circumstances is thereby required. The decisions where the Supreme Court has reviewed *attempt claims* have been the subject of conflicting interpretations. *United States v. Columbia Steel Co., et al.*, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948); *Lorain Journal Co. et al. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951).

The United States Courts of Appeal which have expressly considered the problem, with the possible exception of the Ninth Circuit, have concluded that proof of market power, or market position (with a definition of the relevant market) is necessary to establish a claim under § 2 in addition to the proof of specific intent. The power must be shown to exist in the relevant market, and this power must create the "dangerous probability" referred to in *Swift, supra*. This is a "dangerous probability" of the power to control prices and to exclude competition. *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547 (1st Cir. 1974), cert. denied 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed. 673; *Mullis v. ARCO Petroleum Corporation*, 502 F.2d 290 (7th Cir. 1974); *Morning Pioneer, Inc. v. Bismarck Tribune Company*, 493 F.2d 383 (8th Cir. 1974), cert. denied 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1975); *Panotex Pipe Line Company v. Phillips Petroleum Company*, 457 F.2d 1279 (5th Cir. 1972), cert. denied 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 86 (1972); *Agrashell, Inc. v. Hammons Products Company*, 479 F.2d 269 (8th Cir. 1972), cert. denied 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973); *Kearney & Trecker Corporation v. Giddings & Lewis, Inc.*, 452 F.2d 579 (7th Cir. 1971), cert. denied 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972); *Bernard Food Industries, Inc. v. Dietene Company*, 415 F.2d 1279 (7th Cir. 1969), 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1970); *Volasco Products Company v. Lloyd A. Fry Roofing Company*, 308 F.2d 383 (6th Cir. 1962), cert. denied 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963); *McElhenney Co. v. Western Auto Supply Company*, 269 F.2d 332 (4th Cir. 1959). As to the Ninth Circuit, the court took a contrary view in *Lessig v. Tidewater Oil Company*, 327 F.2d 459 (9th Cir. 1964), cert. denied 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964); *but see also Hallmark Industry v. Reynolds Metals Company*, 489 F.2d 8 (9th Cir. 1973), cert. denied 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974); and *Bushie v. Stenocord Corporation*, 460 F.2d 116 (9th Cir. 1972).

In *Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., supra,* the Court, in relating to a Sherman Act § 2 market definition significantly observed:

*A market definition which is confined to the seller's perspective is not meaningful . . . By necessity, definition of "market" must also focus on attitudes and reactions of consumers.* (Emphasis supplied). 508 F.2d 547 at 551.

Reference is made by the parties to the decision of this Court in *Union Carbide & Carbon Corporation v. Nisley*, 300 F.2d 561 (10th Cir. 1961), appeal dismissed 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962). We there said of the trial court's instructions:

We think the instructions in that regard correctly stated the law of the case, and we do not think it was reversibly erroneous to refuse to define

"attempt to monopolize" beyond the point of telling the jury that the attempt must be accompanied by a specific intent to acquire market power and excludes others from competition. 300 F.2d 561 at 586.

That is to say that an "attempt" must be accompanied by a specific intent. This is much the same as the majority position among the Circuits. We, in *Union Carbide,* held that it was not error for the trial court to fail to define "attempt". The opinion's rule and cases cited in support thereof (i. e., that the jury must find from the greater weight of the evidence that the defendants agreed to restrain trade . . . or that they monopolized or attempted to monopolize, either in concert or individually; and that such unlawful conduct had an injurious impact on the plaintiff's business), held that if the instruction includes the essential elements a party cannot complain that it did not include particular language that he requested (i. e., conduct creating a dangerous probability of monopolization). It is apparent that the decision held that the elements requested by appellant, but in another form, were included in the Court's instructions.

The case at bar was tried on the theory that "dangerous probability" or "reasonable probability" was an element or ingredient in the case. The appellee urges that the appellants did not object to its inclusion in the pretrial order, nor was an objection made to the giving of an instruction on the point. Thus, the parties and the Court all considered that it was a necessary element.

■ Since the "dangerous probability" is that of attaining a successful control of prices in the market, and the power to thus exclude competition therefrom, an evaluation of this probability by the jury necessarily requires that it have the facts as to the *market being considered, and the power of the defendant in it.* The record, as to this element, shows only that there were at the time some five million skiers in the country who were affluent and youthful; that

the market was sought after, and that there were unique marketing problems. This was all that was shown as to the market as such. There was no evidence offered as to the corporate defendant's sales volume in the "skier's cosmetic market" nor the sales volume therein of anyone else. *There was no evidence as to the total sales in the market.* There was no evidence as to the corporate defendant's power as to pricing or as to any other party's power. While it was shown that the defendant corporation had an exclusive endorsement agreement with the USST, this does not prove anything about the cosmetic market among skiers, nor does any dollar amount the corporation may have paid under the contract. The contract does not prove "economic power" in the "market" per se, and it is a valid agreement. And while there is testimony that Bonne Belle, Inc. sought a *hold* on the market there is no evidence in the record that any firm had a hold *on* the market. The assertion that plaintiff was excluded from the market refers to the sale of paks only. This, however, was not the "market" used by the trial court, nor in fact by the parties in the final analysis. There was no pak market. The alleged illegal acts of the defendants were related solely to such packaging for Ski Team endorsement.

■ The critical problem here does not involve a question of proof of damage made at trial or how the damages may be proved. Rather, it is a basic matter of proof of a cause of action, or, more particularly, proof of a prima facie case to go to the jury. Thus, in the absence of any showing by the plaintiff as to where the area of competition existed, or what clout the defendant corporation had therein, it was error for the trial judge to submit the § 2 issue to the jury. No facts were before it upon which to base a verdict, and no facts from which inferences could properly be drawn.

The only established facts were: that Bonne Bell had the economic power to become the official cosmetic of the U.S.

Ski Team; that it had the economic power to pay the USSA over $180,000.00 in minimum retainers during the initial five-year period of its exclusive endorsement contract; that it believed that it had the economic power to develop a "hold" on the skiers' cosmetic market in the United States; that it undertook a "total involvement" in the skiers' cosmetic market in 1966 when it then commenced a specific skiers' oriented advertisement campaign. However, Delaney Corporation did not present any evidence of Bonne Bell's share in the skiers' market in a percentage sense or otherwise. We hold, accordingly, that while the record does establish that plaintiff Delaney Corporation incurred some sales and distribution losses, it failed to delineate the relevant market in question and the power of Bonne Bell in that market. Thus, there are no specific or actual facts in this record developed by Delaney Corporation to Bonne Bell's position in the market. This fatal defect did not provide the jury with the proper standard of the relevant market and the parties' positions therein to measure damages, without undue speculation and the necessity of drawing inferences from inferences.

### III.

Bonne Bell contends that the Court improperly instructed the jury on the relevant market. Bonne Bell alleges that the instruction on relevant market was erroneous because it failed to inform the jury "that the outer limits of that market are established by products which are reasonably interchangeable and competitive with the products in question here."

The Court instructed the jury on relevant market as follows:

As you have been instructed, to find that Defendants attempted to monopolize, you must find that they specifically intended to exclude Plaintiffs from competition in the relevant market. And I will not direct your attention to the phrase, "relevant market".

An allegation of attempt to monopolize has meaning only in connection with a relevant market; that is, it is not sufficient that the Defendants have attempted to monopolize generally, rather the Defendant must have attempted to monopolize some particular segment of trade. The Plaintiffs claim that sales to skiers throughout the United States of cosmetics, health and toilet items and/or kits containing such items constitutes the relevant market in this case.

To find for the Plaintiffs on the attempts to monopolize, you must conclude from the evidence that such a distinct relevant market does in fact exist. There are two important parts of the term "relevant market". One is relevant product market, the other is relevant geographic market. Consequently, to find for the Plaintiffs, you must find that sales to skiers of cosmetic, health and toilet items and/or kits containing such items constitutes a separate and distinct product market, and that the entire United States constitutes the geographic market in which the Plaintiffs intended to compete with the Defendants.

We hold that the Court's instruction adequately advised and guided the jury on the issue of the relevant cosmetics market notwithstanding the reference to "cosmetics, health and toilet items" without restriction to Bonne Bell's cosmetic products or the products within the "pak". The instruction included *all* cosmetics, health and toilet items, and, as such, included products which are "reasonably interchangeable and competitive with the products in question." *United States v. E. I. DuPont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1955); *Cole v. Hughes Tool Company, supra.*

The Trial Court did not make any finding of fact. Following trial, the Court commented only on that which the Court believed the jury concluded and that which the Court believed the jury

could properly have relied upon in support of the general verdict.

We hold that in light of an absence of substantial evidence of the relevant market in question, and of Bonne Bell's requisite economic power therein, there were no issues presented for jury determination relating to the alleged § 2 Sherman Act violation.

■ In view of the fact that the verdict was general, there is no means available to determine which theory of liability, i. e., violation of Section 1 or Section 2 of the Sherman Act the jury based the general verdict upon.

For the reasons discussed above we reverse and remand for new trial consistent with the views expressed herein.